DETROIT NATIONAL BANK v. UNION TRUST CO.[1]

1. BANKS AND BANKING—CERTIFIED CHECK—FRAUD—BURDEN OF PROOF.

In an action against the receiver of an insolvent bank on a fraudulently certified check, the burden is on the plaintiff to show that it is a bona fide holder.

2. SAME—EVIDENCE—SUFFICIENCY.

In an action against the receiver of an insolvent bank on a fraudulently certified check, evidence examined, and held, sufficient to dispute plaintiff's prima facie showing of bona fides, and make a case for the jury.

3. BILLS AND NOTES — FRAUDULENT ISSUE — BONA FIDE PURCHASERS—NOTICE.

The rule that precludes one from claiming rights as a bona

---

[1] Rehearing denied November 7, 1906.

fide purchaser where he had notice of facts that would put an ordinarily prudent man upon inquiry, and failed to take care of his own interests, is not applied to purchasers of commercial paper.

4. BANKS AND BANKING—CERTIFIED CHECKS—FRAUD—BONA FIDE PURCHASER—EVIDENCE.

In an action against the receiver of an insolvent bank on a fraudulently certified check, the issue being whether plaintiff purchased the check upon an honest belief of the validity of the certification, any testimony connected with the transaction, naturally raising doubt of such belief, such as knowledge of plaintiff's officers of the pecuniary standing, methods, and dealings of the drawer of the check and the bank, the volume of similar business done, the terms upon which it was done, whether the transactions were ordinary or usual in their character, and that the business done with the drawer was not communicated to or known by plaintiff's directors, is admissible.

5. SAME—TRIAL—ARGUMENT—PREJUDICE.

In an action against the receiver of an insolvent bank on a fraudulently certified check, the issue being whether plaintiff bank purchased the check upon an honest belief of the validity of the certification, arguments to the jury to the effect that the case was between the stockholders of a bank which had paid $125 for every $100 of stock and the depositors of the insolvent bank, are prejudicial.

6. EXAMINATION OF WITNESSES — CROSS-EXAMINATION — SCOPE OF DIRECT EXAMINATION.

On the issue whether plaintiff bank is a bona fide holder of commercial paper, its witnesses may be cross-examined at length upon the question of bona fides, though they were not examined upon that subject in the direct examination.

7. BANKS AND BANKING—CERTIFIED CHECKS—FRAUD — EVIDENCE.

In an action by a bank upon a fraudulently certified check the facts that much more money was advanced to the drawer upon similar checks than plaintiff was authorized to loan, and that usurious interest was charged him, though not invalidating plaintiff's claim, are admissible on the issue whether the transaction was a legitimate discount of a certified check, or was a mere loan to the maker.

Error to Wayne; Frazer, J.   Submitted May 4, 1906. (Docket No. 89.)   Decided September 20, 1906.

The Detroit National Bank filed its claim with the Union Trust Company, receiver of the City Savings Bank, on certain certified checks, and on disallowance of its claim filed its petition to intervene. An issue was framed and tried on the law side of the court, resulting in judgment for the receiver, and claimant brings error. Reversed.

*Henry A. Harmon* (*Geer, Williams, Martin & Butler*, of counsel), for appellant:

Unless it can be said that the facts and circumstances constitute something more than a mere basis for guess or conjecture, and that the inference of such notice or knowledge on the part of the appellant is clear, it was the duty of the circuit judge to grant the motion to direct a verdict. *Battles* v. *Laudenslager*, 84 Pa. 446; *Hamilton* v. *Vought*, 34 N. J. Law, 187; *Commercial Bank of Danville* v. *Burgwyn*, 110 N. C. 267; *Tescher* v. *Merea*, 118 Ind. 586; *Stevens* v. *McLachlan*, 120 Mich. 285; *Glines* v. *State Sav. Bank*, 132 Mich. 638.

Andrews procured most of his checks on the City Savings Bank to be certified before delivering them to appellant. Therefore he remained liable upon them after delivering them to appellant. *Oyster & Fish Co.* v. *Bank*, 51 Ohio St. 106; *Born* v. *National Bank*, 123 Ind. 78; *Minot* v. *Russ*, 156 Mass. 458; *Andrews* v. *National Bank*, 56 Tenn. 211; *Merchants' Bank* v. *State Bank*, 10 Wall. (U. S.) 604; *Bickford* v. *National Bank*, 42 Ill. 238; *Brown* v. *Leckie*, 43 Ill. 497; *Metropolitan Nat. Bank of Chicago* v. *Jones*, 137 Ill. 634; *Voltz* v. *National Bank*, 158 Ill. 532; *Mutual Nat. Bank* v. *Rotgé*, 28 La. Ann. 933; *Larsen* v. *Breene*, 12 Colo. 480; *Gaden* v. *Savings Bank*, L. R. 22 App. Cas. 281.

Andrews having remained liable upon his certified checks on the City Savings Bank after delivering them to appellant, he had the right to pay them. Any person liable upon negotiable paper has the right to pay it. 2 Daniel on Negotiable Instruments, § 1223.

If the checks had been legally certified, Andrews would have had the right, after having paid them, to surrender them to the City Savings Bank and have the amount thereof again credited to his account. *Buehler* v. *Galt*, 35 Ill. App. 225; *Bills* v. *National Park Bank*, 89 N. Y. 343, 98 N. Y. 87.

Where the interest paid by the borrower is not in excess of the legal rate, the transaction is not usurious, although the lender received from a third party a sum which, if added to that received from the borrower, would make the interest exceed the legal rate. *Clarke* v. *Sheehan,* 47 N. Y. 188; *McArthur* v. *Schenck,* 31 Wis. 673.

Usury is a defense which is personal to the borrower,— and perhaps to his privies. *Farmers' & Mechanics' Bank* v. *Kimmel,* 1 Mich. 84; *Sellers* v. *Botsford,* 11 Mich. 59; *Gray* v. *Lumber Co.,* 128 Mich. 427; *Barney* v. *Surety Co.,* 131 Mich. 192.

The phrase, "in the usual course of business," means "according to the usages and customs of commercial transactions." 1 Daniel on Negotiable Instruments, § 780; Tiedeman on Commercial Paper, § 294; 1 Parsons on Notes & Bills, p. 256; *Tescher* v. *Merea,* 118 Ind. 586; *Kellogg* v. *Curtis,* 69 Me. 212; *First Nat. Bank of St. Thomas* v. *Flath,* 10 N. Dak. 281.

Where the holder has given for the note his money, goods, or credits, at the time of receiving it, or has, on account of it, incurred some loss or liability, he is a holder in due course of trade. Bunker on Negotiable Instruments Law, p. 100; *Merchants' Bank* v. *McClelland,* 9 Colo. 608; *Kimbro* v. *Lytle,* 10 Yerg. (Tenn.) 417; *Miller* v. *Mayfield,* 37 Miss. 688.

The rights of a holder of negotiable paper are to be measured by the simple test of *honesty and good faith.* *Merritt* v. *Boyden,* 191 Ill. 136; *Magee* v. *Badger,* 34 N. Y. 247; *Cheever* v. *Railroad Co.,* 150 N. Y. 59; *Bank of Monongahela Valley* v. *Weston,* 172 N. Y. 259; *Tescher* v. *Merea,* 118 Ind. 586; *Kellogg* v. *Curtis,* 69 Me. 212.

Where it is established by the uncontradicted evidence that the holder of negotiable paper became the owner in good faith, for value, and without notice or knowledge of any infirmity therein, it is the duty of the trial judge to direct a verdict in his favor. *Drovers' Nat. Bank* v. *Potvin,* 116 Mich. 474; *Stevens* v. *McLachlan,* 120 Mich. 285; *Shaw, Kendall & Co.* v. *Brown,* 128 Mich. 573; *Fredonia Nat. Bank* v. *Tommei,* 131 Mich. 674; *Glines* v. *State Sav. Bank,* 132 Mich. 638.

It was incumbent upon defendant to first show, or introduce evidence having a tendency to show, that the plaintiff is not a bona fide holder of the two checks in suit before introducing evidence of the fraudulent inception of

the checks. *Drovers' Nat. Bank* v. *Blue*, 110 Mich. 31; *Shaw, Kendall & Co.* v. *Brown*, 128 Mich. 573; *Fredonia Nat. Bank* v. *Tommei*, 131 Mich. 674.

Declarations by officers or agents of banks in respect to *past* transactions are inadmissible. *Goetz* v. *Bank of Kansas City*, 119 U. S. 551; *Franklin Bank* v. *Steward*, 37 Me. 519; *Franklin Bank* v. *Cooper*, 39 Me. 542; *Lime Rock Bank* v. *Hewett*, 52 Me. 531; *Pemigewassett Bank* v. *Rogers*, 18 N. H. 255; *First Nat. Bank of Lyons* v. *Ocean Nat. Bank*, 60 N. Y. 278; *Merchants' Nat. Bank* v. *Clark*, 139 N. Y. 314; *Bank of Northern Liberties* v. *Davis*, 6 Watts & S. (Pa.) 285.

Publication in a newspaper of a notice of an infirmity or defect concerning a negotiable instrument is not itself constructive notice of such infirmity, and will affect one's character as a bona fide holder only where it can be shown that he is actually cognizant of such publication. *English-American Loan & Trust Co.* v. *Hiers*, 112 Ga. 823; *Boyd* v. *McCann*, 10 Md. 118; *Kellogg* v. *French*, 15 Gray (Mass.), 354; *Clark* v. *Ricker*, 14 N. H. 44; *Hagen* v. *National Bank*, 6 Lans. (N. Y.) 490; *Beltzhoover* v. *Blackstock*, 3 Watts (Pa.), 20; *Goetz* v. *Bank of Kansas City*, 119 U. S. 551.

The circuit judge erred in permitting counsel for the defendant to make certain improper comments in their arguments to the jury. This court has repeatedly reversed judgments for less flagrant violations of the rule against such tactics. *Rutter* v. *Collins*, 96 Mich. 510; *Cluett* v. *Rosenthal*, 100 Mich. 193; *Britton* v. *Railroad Co.*, 118 Mich. 491; *Mott* v. *Railway Co.*, 120 Mich. 127; *Smith* v. *Jennings*, 121 Mich. 393; *Potter* v. *Railway Co.*, 122 Mich. 205; *Selby* v. *Railway*, 122 Mich. 311; *Atherton* v. *De Freeze*, 129 Mich. 364; *Goodspeed* v. *Hildebrand*, 131 Mich. 375; *Ward* v. *Reed*, 134 Mich. 392; *Johnson* v. *Railway Co.*, 135 Mich. 353; *Hillman* v. *Railway*, 137 Mich. 184; *Culver* v. *Railway Co.*, 144 Mich. 254; *Remey* v. *Railway*, 141 Mich. 116.

Neglect to inquire is not evidence of bad faith unless the circumstances are such that the jury would be warranted in inferring that it was *willful*, and done with the purpose to avoid the discovery of the facts impeaching the validity of the negotiable paper in question. *Schmueckle* v. *Waters*, 125 Ind. 265; *Whaley* v. *Neill*, 44 Mo. App. 316; *Miller* v. *Finley*, 26 Mich. 249.

The rule is that *gross* negligence is not of itself evidence

of bad faith, but that bad faith *may* be inferred from *willful* negligence. *Murray* v. *Lardner,* 2 Wall. (U. S.) 110; *Collins* v. *Gilbert,* 94 U. S. 753; *Brown* v. *Spofford,* 95 U. S. 474; *Frank* v. *Lilienfeld,* 33 Grat. (Va.) 377; *Seybel* v. *National Currency Bank,* 54 N. Y. 288; *Chapman* v. *Rose,* 56 N. Y. 140; *Canajoharie Nat. Bank* v. *Diefendorf,* 123 N. Y. 202; *Comstock* v. *Hannah,* 76 Ill. 530; *Shreeves* v. *Allen,* 79 Ill. 553; *Merritt* v. *Boyden,* 191 Ill. 136; *Pond* v. *Agricultural Works,* 50 Iowa, 596; *Citizens' Nat. Bank of Baltimore* v. *Hooper,* 47 Md. 88; *New Orleans, etc., R. Co.* v. *Mississippi College,* 47 Miss. 560; *Davis* v. *Seeley,* 71 Mich. 219; 1 Daniel on Negotiable Instruments, §§ 774, 775.

This court has several times held that where it is shown that negotiable paper is of fraudulent inception the burden of proof is on the holder to establish his bona fides. *Mace* v. *Kennedy,* 68 Mich. 389; *Stevens* v. *McLachlan,* 120 Mich. 285; *Glines* v. *State Sav. Bank,* 132 Mich. 638.

However, this court has never defined the limits of this doctrine. The rule followed by the weight of authority, at least, is that where it is shown that negotiable paper is of fraudulent inception, the burden shifts to the holder to show that he became the owner thereof before maturity, for value, and in the usual course of business, but that when he shows that he is a holder for value, the burden is again shifted to the maker or indorser to show that he had notice or knowledge of the fraud. The reason for casting the burden upon the holder, when it is shown that the paper is of fraudulent inception, is that in such cases experience has shown that the fraudulent payee will transfer the paper to a third person to be enforced. However, it is not likely that an indorsee, cognizant of the fraud, would have paid full value, and where the indorsee shows that he paid full value, the reason for the rule does not exist, and therefore the rule itself should not be applied. *Davis* v. *Bartlett,* 12 Ohio St. 541; *Tod* v. *Wick Brothers & Co.,* 36 Ohio St. 390; *Eames* v. *Crosier,* 101 Cal. 263; *Kellogg* v. *Curtis,* 69 Me. 212; *Market & Fulton Nat. Bank* v. *Sargent,* 85 Me. 349; *Jones* v. *Burden,* 56 Mo. App. 199; *First Nat. Bank of St. Thomas* v. *Flath,* 10 N. Dak. 281; *Hart* v. *Potter,* 4 Duer (N. Y.), 458; *Commercial Bank of Danville* v. *Burgwyn,* 110 N. C. 267; *Fitch* v. *Jones,* 5 El. & Bl. 238;

*Carrier* v. *Cameron*, 31 Mich. 378; 1 Daniel on Negotiable Instruments, § 819.

*Bowen, Douglas, Whiting & Murfin* (*John C. Donnelly*, of counsel), for appellee:

The witness De Graff, whose testimony is relied upon to take the case from the jury in favor of the plaintiff, was an interested witness. The rule is well settled that the court and jury are not bound to accept unqualifiedly the testimony of an interested witness. On the contrary, under the rule referred to, the jury are at liberty to disregard and disbelieve the testimony of an interested witness, and especially is that so where the witness is the party more or less responsible for the transaction and whose action would be subject to criticism and condemnation should the party in whose behalf he testifies and for whom he acted fail in the litigation. *Canajoharie Nat. Bank* v. *Diefendorf*, 123 N. Y. 191; *Elwood* v. *Telegraph Co.*, 45 N. Y. 549; *Honegger* v. *Wettstein*, 94 N. Y. 252; *Stilwell* v. *Carpenter*, 2 Abb. New Cas. (N. Y.) 239; *Kavanagh* v. *Wilson*, 70 N. Y. 177; *Union Trust Co.* v. *Preston Nat. Bank*, 136 Mich. 460; *Peirson* v. *McNeal*, 137 Mich. 173–177; *Iowa Nat. Bank of Ottumwa* v. *Sherman*, 17 S. Dak. 396; *Pelly* v. *Onderdonk*, 61 Hun (N. Y.), 314; *Bookheim* v. *Alexander*, 64 Hun (N. Y.), 458; *Vosburgh* v. *Diefendorf*, 119 N. Y. 357; *Merchants' Nat. Bank of Binghamton* v. *Tracy*, 77 Hun (N. Y.), 443; *Miller* v. *Boyer*, 79 Hun (N. Y.), 131; *Kingsland Land Co.* v. *Newman*, 1 App. Div. (N. Y.) 1; *Tracey* v. *Town of Phelps*, 22 Fed. 634; *Quock Ting* v. *U. S.*, 140 U. S. 417; *Joy* v. *Diefendorf*, 130 N. Y. 6; *Woodin* v. *Durfee*, 46 Mich. 427; *Brand* v. *Johnrowe*, 60 Mich. 210; *Trinity County Lumber Co.* v. *Denham*, 88 Tex. 203.

The credibility of a witness is solely a question for the jury. See *Perrott* v. *Shearer*, 17 Mich. 48; *Sheahan* v. *Barry*, 27 Mich. 217; *Blackwood* v. *Brown*, 32 Mich. 104; *Elliott* v. *Van Buren*, 33 Mich. 49; *Hayes* v. *Homer*, 36 Mich. 374; *Richards* v. *Fuller*, 38 Mich. 657; *Nicholson* v. *Dyer*, 45 Mich. 610; *Mawich* v. *Elsey*, 47 Mich. 10; *Tallon* v. *Mining Co.*, 55 Mich. 148; *Davis* v. *Gerber*, 69 Mich. 253.

The jury were entitled to consider the illegality of the loans to Andrews and the fact that usurious interest was charged thereon on the question whether the paper was

taken in good faith and in the usual course of business.
*Saltmarsh* v. *Tuthill*, 13 Ala. 410. And see, also: *Saltmarsh* v. *P. & M. Bank*, 14 Ala. 679; *Carlisle* v. *Hill*, 16 Ala. 406; *Smith* v. *Lehman*, 85 Ala. 394; *Wailes* v. *Couch*, 75 Ala. 134; *McCall* v. *Rogers*, 77 Ala. 349; *Hart* v. *Adler*, 109 Ala. 469; *Ramsdell* v. *Morgan*, 16 Wend. (N. Y.) 574; 1 Daniel on Negotiable Instruments, § 751; *Eastman* v. *Shaw*, 65 N. Y. 522; *Rodecker* v. *Littauer*, 59 Fed. 857; *Hamill* v. *Mason*, 51 Ill. 488; *Bock* v. *Lauman*, 24 Pa. 444; Eaton & Gilbert on Commercial Paper, p. 306; *Sweet* v. *Chapman*, 7 Hun (N. Y.), 579; Edwards on Bills and Notes (3d Ed.), p. 372; Norton on Bills and Notes (3d Ed.), p. 242; *Powell* v. *Waters*, 17 Johns. (N. Y.) 177; *Powell* v. *Waters*, 8 Cow. (N. Y.) 669; *Clark* v. *Sisson*, 22 N. Y. 315; Wood's Byles on Bills and Notes, p. 466; *Canajoharie Nat. Bank* v. *Diefendorf*, 123 N. Y. 191; *Hall* v. *Wilson*, 16 Barb. (N. Y.) 550; *Bank of Monongahela Valley* v. *Weston*, 172 N. Y. 259; *Baily* v. *Smith*, 14 Ohio St. 396; *Munn* v. *Commission Co.*, 15 Johns. (N. Y.) 44.

The jury were justified in finding that plaintiff did not take the checks in suit "in the usual course of business" and consequently were justified, under the testimony, in finding a verdict for defendant. *Union Trust Co.* v. *Preston Nat. Bank*, 136 Mich. 460; *Roberts* v. *Hall*, 37 Conn. 205; *Merriam* v. *Granite Bank*, 8 Gray (Mass.), 254; *Crosby* v. *Grant*, 36 N. H. 273; *Merchants' Bank* v. *State Bank*, 10 Wall. (U. S.) 604; *Mussey* v. *Eagle Bank*, 9 Metc. (Mass.) 306; *Dorsey* v. *Abrams*, 85 Pa. 299.

HOOKER, J. The City Savings Bank of Detroit closed its doors and went into the hands of a receiver, owing to the failure of its vice president, Frank C. Andrews. The Detroit National Bank filed a claim against it, based upon two checks, drawn by Andrews, certified by the assistant cashier of the city bank, and discounted by Andrews at the Detroit National Bank. The case was tried by a jury, a verdict was found for the defendant, and the claimant has appealed.

The case must ultimately turn upon the bona fides of claimant's purchase of the checks, and as the more important assignments of error relate to that question, we will discuss it first.

1. It is not disputed that the certificates were fraudulent, being made when Andrews had no funds in the city bank, and it was incumbent upon the plaintiff to show that it was a bona fide holder. See *Thompson* v. *Village of Mecosta*, 127 Mich. 528, and cases cited, 141 Mich. 175. The claimant made a prima facie showing, by the testimony of its officers, that they took this paper for value, and in good faith, honestly believing that the drawer had an adequate deposit in the city bank at the time of the certification, and it is claimed that this testimony was not disputed, and therefore that the court erred in refusing to direct a verdict for the plaintiff. This point is well taken, provided there is no testimony contradictory to that mentioned.

Defendant's counsel say that there is such testimony, and we will allude to it in a general way. The assistant cashier of the city bank, on cross-examination (which we may parenthetically remark was, in our opinion, opportune and proper), testified to the fraudulent character of the certification. De Graff, claimant's cashier, who discounted these checks, testified at length, upon cross-examination, that during November and December, 1901, and January and February, 1902, the claimant received from Frank C. Andrews many of his checks certified by the city bank, some of which were paid, through the clearing house, others being withheld from clearings for a day or so, at Andrews' request, and some taken care of otherwise by him, and that in such cases interest or a bonus was charged him by claimant. Of the latter class, the aggregate in January was $1,311,000, those that went through the clearing house amount to $1,236,000. There were 21 of these checks, in both classes. The total amount of certified checks was $6,220,000. Drafts on New York being given for some or all of these checks, interest was charged as upon a loan up to the time of payment of the check. It is claimed that these charges were usurious and furnished a motive for these transactions. During the same time Andrews was drawing

large checks upon the Detroit National Bank (overdrawing his account largely) in favor of the city bank, and it was claimed by counsel that this was a pernicious practice, known to banks as "kiting checks," and must have been known and acquiesced in by the claimant; that Andrews' practice of overdrawing upon claimant continued until he was notified that he must not do it, without advising claimant. It was further shown that plaintiff's cashier knew that Andrews was speculating in stocks during this time, and had heard that he lost some money on Amalgamated copper, which the claimant was taking as collateral, and may have known of its value. The cashier testified that his assistant cashier criticised the method of doing business with Andrews.

On behalf of the defendant, Andrews testified that he asked that the checks be withheld for the reason that the bank had not the money to pay them. He further stated that he was requested to get the checks certified. Claimant's assistant cashier testified to cautioning the cashier against the business being done with Andrews, and on one occasion the cashier said he wondered whether a given certificate was bona fide.

It is a general rule applicable to transactions not involving commercial paper, that where one has notice of facts which would put an ordinarily prudent man upon inquiry, he cannot be considered a bona fide purchaser, if he neglect to take such care of his own interests as an ordinarily prudent man would do, but that rule has not been applied to commercial paper. In *National Bank of Republic* v. *Young*, 41 N. J. Eq. 531, the court said:

"The transaction upon which this conclusion was based was as follows: By the testimony of Buckley, who was the vice president of the bank and personally acted for the bank in negotiating the loan of December 31st, it appears that on the 28th or 29th of December, in an interview with the president of the crucible company, the latter told him that Fowler, Crampton & Co. held some $600,000 of borrowed paper of the crucible company. Upon this tesmony the vice chancellor remarked that 'the notice was

amply sufficient to put him upon inquiry; it was such as would have led a prudent man, taking reasonable care of his own interests, to make further inquiry.' And in the statement of the principle by which his judgment should be governed, the vice chancellor laid down the doctrine of the law to be that 'notice or knowledge, in this connection, does not mean that the maker of the paper must bring home to its holder actual knowledge of the infirmity which renders the paper valueless, but it will be sufficient if it is shown that he had the means of knowledge; that is, that he had notice of such facts as would have led a prudent man to further inquiry, which inquiry, if pursued, would have disclosed the infirmity of the paper.'

"This statement of the doctrine of notice in its effect with respect to the bona fide character of a transaction, as a general rule, is undoubtedly correct; but it is inapplicable to negotiable commercial paper, which, in virtue of its commercial character, and the need of sustaining its negotiable quality, cannot be impeached in the hands of a subsequent holder taking it for value before maturity, unless his title was acquired under such circumstances as show actual fraud in the party so taking it.

"In *Gill* v. *Cubitt*, 3 Barn. & Cress. 466, the court of king's bench held that the title of the holder of commercial paper was impeached so as to let in defenses to which such paper would have been subject in the hands of the original party, where it appeared that he had taken it under circumstances 'which ought to have excited the suspicion of a prudent and careful man.' But the doctrine of that case has been overruled in England and in the Supreme Court of the United States, and generally in the courts of sister States. *Goodman* v. *Harvey*, 4 Adol. & El. 870; *Goodman* v. *Simonds*, 20 How. (U. S.) 343; *Murray* v. *Lardner*, 2 Wall. (U. S.) 110; 1 Daniel on Negotiable Instruments, § 775."

We have held several times that notice of facts which would be sufficient to arouse the suspicion of an ordinarily prudent man is not enough to preclude good faith in a purchase. It is a matter of mala fides. *Stevens* v. *McLachlan*, 120 Mich. 290; *Fredonia Nat. Bank* v. *Tommei*, 131 Mich. 674; *Glines* v. *State Sav. Bank*, 132 Mich. 638; *Thompson* v. *Village of Mecosta*, 141 Mich. 175.

A learned discussion of the subject will be found in the case of *Jones* v. *Gordon*, L. R. 2 App. Cas. 627, where Lord Blackburn, rendering the opinion, is reported to have said:

"I should be extremely sorry to say anything which should cast doubt upon the principle that a bill of exchange, or a negotiable instrument of that sort, is negotiable to the fullest extent of its kind. The negotiation of these bills of exchange, in a mercantile country like this, is of very great value.   *   *   *

"Farther, my Lords, I think it is right to say that I consider it to be fully and thoroughly established that if value be given for a bill of exchange, it is not enough to show that there was carelessness, negligence, or foolishness in not suspecting that the bill was wrong, when there were circumstances which might have led a man to suspect that. All these are matters which tend to show that there was dishonesty in not doing it, but they do not in themselves make a defense to an action upon a bill of exchange. I take it that in order to make such a defense, whether, in the case of a party who is solvent and sui juris, or when it is sought to be proved against the estate of a bankrupt, it is necessary to show that the person who gave value for the bill, whether the value given be great or small, was affected with notice that there was something wrong about it when he took it. I do not think it is necessary that he should have notice of what the particular wrong was. If a man, knowing that the bill was in the hands of a person who had no right to it, should happen to think that perhaps the man had stolen it, when if he had known the real truth he would have found, not that the man had stolen it, but that he had obtained it by false pretenses, I think that would not make any difference, if he knew that there was something wrong about it and took it. If he takes it in that way he takes it at his peril.

"But then I think that such evidence of carelessness or blindness as I have referred to may, with other evidence, be good evidence upon the question which, I take it, is the real one, whether he did know that there was something wrong in it. If he was (if I may use the phrase) honestly blundering and careless, and so took a bill of exchange or a bank note when he ought not to have taken it, still he would be entitled to recover. But if the facts and cir-

cumstances are such that the jury, or whoever has to try the question, came to the conclusion that he was not honestly blundering and careless, but that he must have had a suspicion that there was something wrong, and that he refrained from asking questions, not because he was an honest blunderer, or a stupid man, but because he thought in his own secret mind—I suspect there is something wrong, and if I ask questions and make further inquiry, it will no longer be my suspecting it, but my knowing it, and then I shall not be able to recover—I think that is dishonesty. I think, my Lords, that that is established not only by good sense and reason, but by the authority of the cases themselves."

See *Canajoharie Nat. Bank* v. *Diefendorf*, 123 N. Y. 191 (10 L. R. A. 676), and our own case of *Goodrich* v. *McDonald*, 77 Mich. 486, where it is held that bad faith may be inferred from testimony not direct nor positive, proof of those kinds being frequently unobtainable. See, also, *Peirson* v. *McNeal*, 137 Mich. 173-177, and cases cited. There are many similar cases, some of which will be found in the briefs.

Were this question before us in an equity case, upon the merits, we should necessarily consider the weight of the testimony pro and con. Upon this record we can only determine whether the circumstances, taken together, tend to show mala fides, whether a jury might legitimately find from them that the plaintiff's cashier did have a suspicion that this was a fraudulent certification, and "refrained from making inquiry lest he should know that it was so," and therefore properly a question for the jury. The burden being upon the plaintiff to establish bona fides (see *Thompson* v. *Village of Mecosta*, 127 Mich. 522, 141 Mich. 175), the question was one for the jury, if plaintiff's testimony was contradicted. We think that it was disputed by circumstances having a tendency to show grounds of suspicion at least, and of a character which made the subject a question for the jury, justifying a verdict for the defendant, if the circumstances shown convinced them that plaintiff's cashier did not entertain

an honest belief that Andrews had the requisite deposit
at the time of the purchase.   The crucial question being
whether the checks were purchased upon an honest belief
of the validity of the certification, any testimony con-
nected with the transaction, naturally raising doubt of
such belief, was admissible.   It was competent to show
the knowledge of plaintiff's officers as to the pecuniary
standing, methods, and dealings of Andrews and the City
Savings Bank, the volume of similar business done, and
the terms upon which it was done, and whether transac-
tions were ordinary or usual in their character.   It was
proper to show that the business done with Andrews was
not communicated to or known by plaintiff's directors.

The plaintiff had a right to a fair, temperate, and im-
partial consideration of the question, whether its cashier
discounted these checks in the honest belief that Andrews
had a deposit in the city bank at the time, equal in amount
to the checks.   That is all there was of the case.   It was
not a question depending upon the condition of the plain-
tiff bank, or whether, when its business was closed up, its
stockholders received $125 for each share of stock.   Based
on a question merely (for the witness did not answer it in
the affirmative, and for that matter it would have been no
better had he done so), counsel for the defendant argued
that the bank had paid its stockholders 120 cents on the
dollar, or more.   He said:

"This controversy is not between the Detroit National
Bank and the Union Trust Company; the question for
you to determine is whether these stockholders of the
bank which was wound up and paid its stockholders 120
cents on the dollar, or more than that, so far, or the
depositors of the City Savings Bank are going to get this
money that is now here in litigation.   *   *   *

"And the testimony shows that the stockholders of that
bank had received for every $100 worth of stock $120 at
least before this suit was brought; in other words—

"*Mr. Geer:* I desire to take an exception to that. .

"*Mr. Whiting:* I thought that would come.   That is,
for the million dollars of stock that they originally had in
that bank, before commencement of this suit, they had

received $1,200,000, and there is more to come, because it has not been wound up. Of course he will object to it. And that came from that reliable witness, Mr. De Graff—

"*Mr. Geer:* I think I have a right to take an exception.

"*Mr. Whiting:* Certainly he has a right to make objection, and I have a right to comment on it.

"*The Court:* Note an exception to it.

"*Mr. Whiting:* Let him make all the objections he wants. I tell you the testimony is just as I say. Mr. De-Graff told me, and if counsel had listened, he would have heard it, that the stockholders received at least $120 for every $100 they had of stock of the bank. So that, if the suit is brought in the name of the Detroit National Bank, it is brought by those who are to benefit by it, and those are the stockholders in that bank. It is brought against the receiver of the City Savings Bank, not against the bank but against the receiver, because under the State law the commissioner of banking caused to be appointed a receiver for the City Savings Bank, when he found that through Andrews it was necessary to put it out of business. The receiver represents not alone the stockholders but he represents the depositors, the savings depositors and the commercial depositors of the City Savings Bank, and on the 10th of February, 1902, when this bank's doors were closed, the depositors of the City Savings Bank held claims against that bank for money which the bank had had of about $3,000,000. Of those about 1,600,000 or 1,700,000 were savings depositors, the rest, about 1,400,000 or 1,500,000 were commercial depositors. Those are the people whom this receiver represents and who are really in fact the defendants in this case.

"*Mr. Geer:* To that I object.

"*Mr. Whiting:* The depositors of the City Savings Bank—

"*Mr. Geer:* I desire to object to that argument, because it is wholly immaterial to this issue.

"*The Court:* Note an exception.

"*Mr. Whiting:* The stockholders of the City Savings Bank; and when the depositors are paid in full, when the depositors get that three million dollars and they get the expenses of the receivership paid, then the stockholders of the City Savings Bank are going to get something, but not until then. That is the condition as it exists, and that

is the actual circumstance under which this suit is brought. What is it brought for? To recover on two checks drawn by Frank C. Andrews on the City Savings Bank and claimed to have been certified by the City Savings Bank. Mind that word certified means what this man Schrage did by writing on the face of the check. Let me take the checks.

"*Mr. Geer:* I have not got them. [Mr. Harmon hands papers.]

"*Mr. Whiting:* That is what that means when we say certified, it applies to 'Good, Schrage, Teller.' Look at that and at the other one. There is nothing magical about that. That was all that there was meant by certification, that little expression, 'Good, Schrage, Teller.' They seek to recover from this City Savings Bank, or from the receiver of the City Savings Bank, the amount of these two checks, and they say it is $160,000. Of course, you would not know it, or I would not know it if we looked at the papers, because the papers are for $100,000 and for $110,000, and they pretend to claim that there has been $50,000 paid on one of them, and that there is only $60,000 due on it. That is the one there. They want to receive from your hands, from this bank—a verdict against that bank for $160,000, and 5 per cent. interest for three years.

"*Mr. Geer:* To that I take an exception.

"*Mr. Whiting:* There is about $8,000 a year of interest besides the face of these checks. The legal rate of interest in this State happens to be 5 per cent., and the interest on this $160,000 at the legal rate is what they seek to recover at your hands; if they don't, I want to know it; counsel has objected to it, but when he gets up to tell you about it he will tell you that they want the $160,000 and interest, and that is about $8,000 a year, and if you give it for three years, that is for $24,000 more than the face of these checks, making it $184,000, that they are after, before these $3,000,000 of depositors get anything."

We have seen that the rule is not different where the claim is against the estate of a bankrupt, than in other cases. See *Jones* v. *Gordon*, L. R. 2 App. Cas. 627, and it would shock the sense of justice of any impartial person, should this court announce the doctrine that the jury were at liberty to determine that the plaintiff should not re-

cover, for the reason that it was solvent, while the creditors of the city bank were poor. It would have been error had the trial judge said so. Yet this is the idea running through the argument. Counsel are officers of court. They are learned in the law. They have the opportunity of acquiring a high appreciation of fairness and justice. They should not have made such unfair argument to the jury. The courts, and men whose interests are before the courts, have a right to have cases tried fairly, and that appeals calculated to arouse the sympathies and prejudices of jurors, who do not as a rule discriminate closely when the opportunity offers to bestow charity at the expense of litigants, be not made. If counsel cannot restrain themselves from making unfair appeals we have no alternative but to set aside the verdicts thus obtained, and we owe it to the cause of common justice to severely condemn the practice, whether it is the result of undue excitement and zeal merely, which palliates it, or to a deliberate premeditated intention to obtain an undue advantage. We have spoken more plainly and at length upon this subject than we have ordinarily done, not because the arguments of counsel in this case have exceeded in impropriety those made in many other cases, but because of the necessity arising from abuses, the increase of which comments heretofore made have proven inadequate to check. We have attempted to stigmatize the practice as it deserves, and as every practitioner looks upon it, when he is made its victim, with a view to its correction, to which every circuit judge should be assiduous, and in which we bespeak the moral support of the members of the bar, who are personally quite as much interested as the judges can be.

There are many assignments of error which we must of necessity omit to discuss at length. We cover many of them when we say that it was competent for the defense to show the prior transactions of the parties, and plaintiff's knowledge of Andrews' pecuniary circumstances, business, and methods of doing business.

We think it was competent for counsel for the defendant to cross-examine at length the witnesses of the plaintiff upon the question of bona fides, though they were not examined upon that subject in the direct examination. We have no doubt that the record is much larger than it need have been, and that much of the testimony was of little value and might have been properly omitted upon the trial, but this did not necessarily amount to a cause for reversal. Comment was made on the fact that much more money was advanced to Andrews, on the certified checks, than the bank was authorized to loan. That certainly did not of itself invalidate plaintiff's claim, nor did any usurious charges made, but if, as appears to be claimed, these transactions were really loans to Andrews, instead of a legitimate discounting of certified checks, they were circumstances to be considered upon the main question.

It was proper to impeach De Graff by the testimony of Stewart. It was also competent to show by Stewart, as part of the res gestæ, that at the time of taking a certified check De Graff expressed doubt of its validity, if such was the proof. It would of course be incompetent to show admissions of De Graff as such.

We think that it was competent to offer evidence tending to show printed official statements of the city bank, brought to the knowledge of the plaintiff's officers, containing an item of only $10,000 of certified checks, when plaintiff's officers must have known that it held a much greater amount of such checks at the time.

We think it unnecessary to refer to the assignments of error upon the charge, as the discussion of the other assignments will suffice.

The judgment is reversed, and a new trial ordered.

MCALVAY, BLAIR, MONTGOMERY, and OSTRANDER, JJ., concurred.