PEOPLE'S STATE BANK *v.* MILLER.

1. FRAUD — NEGOTIABLE INSTRUMENTS — BILLS AND NOTES — MISREPRESENTATIONS.

Where defendant notified a firm of brokers to purchase certain stock which he did not pay for at the time, and where an officer of the brokerage firm later advised the defendant that they had purchased the stock and he thereupon paid a portion of the price by check, the false representation, in advising defendant that the stock had

been purchased, amounted to fraud in procuring the check, under the negotiable instruments law, Act No. 265, Pub. Acts 1905, § 57 (2 How. Stat. [2d Ed.] § 2728), and gave rise to a defense in defendant's favor against the paper in the hands of a third party.

2. SAME — CHECK — FRAUDULENT REPRESENTATIONS — BURDEN OF PROOF.

   Upon proof of a fraud of the brokerage firm in procuring defendant's check, the burden of proof rested upon the plaintiff to prove that it acquired title in due course for a valuable consideration and in good faith. Sections 54-61, Act No. 265, Pub. Acts 1905.

3. BILLS AND NOTES—CHECKS—PRINCIPAL AND AGENT—EVIDENCE.

   Where the plaintiff bank had printed upon its pass book a notice to customers that in receiving checks and drafts, etc., for deposit, it acted as agent only and assumed no responsibility beyond carefulness in selecting its agents, that the amount of dishonored checks or drafts would be charged to the customer, plaintiff bank was not a holder in good faith but was agent for the collection; title to the paper remained in the depositor.[1]

4. SAME—BANKS AND BANKING—NEGOTIABLE INSTRUMENTS.

   The fact that plaintiff permitted its patrons to check against the credit allowed upon paper deposited for collection did not preclude the bank from charging back the amount of the dishonored check; the title vested and remained in the depositor.

5. BANKS AND BANKING — BONA FIDE PURCHASER — BILLS AND NOTES.

   Where there was evidence that defendant's brokerage firm engaged in extensive "kiting" operations with the plaintiff bank, that its officials were familiar with the methods employed by the firm and permitted the same, having notice of its insolvency, and there was evidence that a large amount of paper deposited to the credit of the brokers was for the purpose of procuring a fictitious credit, evidence tending to show the real nature of the transactions was properly received as a defense to the action of plaintiff bank as holder in due course of a check deposited by the brokers who had obtained the paper by misrepresentation.

---

[1] The question of the title of a bank to a check drawn on another bank, which has been credited to depositor is treated in notes in 7 L. R. A. (N. S.) 694 and 47 L. R. A. (N. S.) 552.

6. SAME—NEGOTIABLE INSTRUMENTS—BONA FIDE HOLDER.

Where the plaintiff bank, through its assistant cashier, assented to the action of the brokerage firm in kiting checks and otherwise procuring fictitious credit upon its books, the contention that because plaintiff bank had made advances on the faith of the check received as a deposit for collection from the brokers, who had fraudulently procured the same from defendant, would not sustain an action in plaintiff's favor as a holder in due course.

Error to Wayne; Halley, J. Submitted January 6, 1915. (Docket No. 15.) Decided April 19, 1915. Rehearing denied July 23, 1915.

Action by People's State Bank against Guy A. Miller upon a dishonored check. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Keena, Lightner, Oxtoby & Oxtoby,* for appellant.

*Alex. J. Groesbeck,* for appellee.

KUHN, J. The defendant, who is a practicing attorney in the city of Detroit, in the year 1908 occasionally bought and sold stock through Cameron Currie & Co., a firm of brokers, whose business methods have been reviewed and passed upon by this court in the recent case of *Austin* v. *Hayden,* 171 Mich. 38 (137 N. W. 317). This firm of brokers were customers of the plaintiff bank, and for some years up to the date of their failure maintained with it a general deposit and checking account. On the 10th day of July, 1908, Mr. Miller gave an order to Cameron Currie & Co. to purchase for his account 100 shares of United States Steel common stock, but did not pay the brokers firm any money at that time. Mr. Miller, being advised by the firm that they had purchased the stock pursuant to this order, on the 15th day of July paid them $500, to be applied on the purchase

price of the stock, which was $4,012.50. On that day
Mr. Miller saw Mr. Case, who was a member of the
brokers firm, and told him that he proposed borrow-
ing the money at the Michigan Savings Bank to pay
the balance on the stock, and asked him whether he
would carry the transaction for a few days and have
the certificate made out in his name, to be transferred
on the books of the steel corporation, to which it is
claimed Mr. Case agreed, and upon the 17th of July,
1908, at about 1 o'clock in the afternoon, Mr. Miller
delivered to Mr. Case a check which read as follows:

"No. 400.        Detroit, Mich., 7/17/1908.
    "Michigan Savings Bank of Detroit:
    "Pay to the order of Cameron Currie & Co.
$3,526.37, three thousand five hundred twenty-six
37/100 dollars.        Guy A. Miller."

Written in red ink across the face of the check was
"Payment stopped." Indorsed on the face of the
check was the following:

    "Protested July 18, 1908, for nonpayment. James
S. Park, Notary Public, Wayne Co., Mich."

Indorsed on the back of the check was this:

    "Pay to the order of the People's State Bank, De-
troit, Mich. Cameron Currie & Co."

When he presented the check, Mr. Miller asked Mr.
Case when the certificate made out in his name would
be along, and Mr. Case replied that it had been order-
ed and would probably be there on the morning of the
18th of July, or certainly on the 20th. His check was
deposited by Cameron Currie & Co. with the plaintiff
bank during banking hours on the afternoon of July
17th. At about 8:30 o'clock on the morning of July
18th a receiver was appointed for and took possession
of the affairs of Cameron Currie & Co. Mr. Miller,
having learned that morning of the failure of the
brokerage firm, upon inquiry at their office concerning
the check he had given the day before, was informed

that it had been deposited at the People's State Bank. He thereupon went to the bank before it was open for business, and saw Mr. Lawson, who was the vice president of the bank, and told him of the circumstances under which he had given the check, and demanded its return to him. Mr. Lawson told him that the check had been cashed, and refused to surrender it to Mr. Miller, and Mr. Miller thereupon went to the Michigan Savings Bank and stopped payment on the check. An action in assumpsit was thereupon brought upon the check by the plaintiff, and the plea herein is the general issue, with notice that the check was given to the payee in payment for 100 shares of United States Steel Company stock; that the check was delivered to payee with instructions to use the same in full payment for said stock, and with the further instruction to secure a certificate for such stock and deliver the same to defendant; that such stock certificate was not procured by said payee and has not been delivered to defendant; that the failure to so procure and deliver said stock certificate, together with the taking of said check, constituted a fraud as between defendant and payee; that, at the time the check was indorsed by the payee to the plaintiff, payee was insolvent; that plaintiff at that time knew payee was insolvent, and had knowledge of the facts constituting a defense as between defendant and payee; that the plaintiff parted with no value whatever on the receipt of said check, and had knowledge or notice of such facts as to make its acceptance of the check a bad-faith and not a good-faith acceptance.

At the conclusion of the evidence the trial judge, reading the provisions of section 54 of the negotiable instruments law of this State (Act No. 265, Pub. Acts 1905, 2 How. Stat. [2d Ed.] § 2725), charged the jury that the check is complete and regular upon its face; that the bank became a holder of the check

before it became overdue; that there was no evidence that it had been previously dishonored; that the bank took it in good faith; that at the time it was negotiated with the bank it had no notice of any infirmity in the instrument or defect in the title of the person negotiating it; but that there was no affirmative evidence that the bank parted with value or gave any consideration for the check, and upon that ground the jury was directed to render its verdict for the defendant. Judgment being entered thereon, the plaintiff brings the case here by writ of error.

The trial court found, and so instructed the jury, that, in taking the check under the circumstances under which it was taken, a fraud was perpetrated by Cameron Currie & Co. upon Mr. Miller, and that therefore the title to the check was defective. It is contended by appellant that this instruction to the jury was not warranted because there is no evidence of any infirmity or defect in the check in suit as between the defendant and Cameron Currie & Co.

Section 57 of the negotiable instruments law provides as follows:

"The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

It conclusively appears in this case that Cameron Currie & Co. assumed to act as agents for Mr. Miller in buying the 100 shares of steel common stock, for which they were to be paid a commission; and also that they fraudulently stated to him that the stock had been ordered transferred to his name on the books of the steel corporation, whereas in fact it was not so transferred; and also that, at the time the check was delivered by them to the bank, they were insolvent,

and had taken proceedings looking to the appointment of a receiver, the bill of complaint upon which the receiver was appointed having been signed and sworn to on the 17th day of July. It appears from the opinion of this court in *Austin* v. *Hayden, supra,* that they were hopelessly insolvent as far back as July, 1907, and that Hayden, Stone & Co. were held to be parties to the fraud of Cameron Currie & Co. in their dealings with their customers after June 23, 1908. We are therefore of the opinion that the trial judge was right in his conclusion that the transaction between Cameron Currie & Co. and Mr. Miller was a fraudulent one, and that the title to the check in them, by reason thereof, was defective.

On the trial of this cause, the plaintiff first introduced the check in evidence, and thereupon rested. The defendant thereupon proved the fraud of Cameron Currie & Co. in obtaining the check. By virtue of section 61 of the negotiable instruments law, the burden thereupon rested upon the plaintiff to prove that it acquired the title as a holder in due course, and it became incumbent upon it to show affirmatively that as a holder in due course, under the conditions enumerated in section 54 of said negotiable instruments law, it took the check in good faith and for value. *Thompson* v. *Village of Mecosta,* 127 Mich. 522 (86 N. W. 1044) ; *Merchants' National Bank* v. *Wadsworth,* 166 Mich. 528, 531 (131 N. W. 1108).

On the 17th day of July, Cameron Currie & Co. made four separate deposits in the plaintiff bank, and the aggregate deposits of that day amounted to $75,968.78. In accordance with the bank's business methods, the aggregate amount of the items deposited, as shown by the deposit slips when received by the teller of the bank, was credited by him in the passbook of the customer, on the top of the first leaf of which book was printed the following:

"Notice.—Checks on this bank will be credited conditionally. If not found good at the close of business they will be charged back to depositors, and the latter notified of the fact. Checks on other city banks will be carried over for presentation through the clearing house on the following day. This bank, in receiving check or draft on deposit or for collection, acts only as your agent, and, beyond carefulness in selecting agents at other points and in forwarding to them, assumes no responsibility. Should returns sent by collecting agents for said item be dishonored, the amount will be charged to account and the draft delivered to customers."

It also appears that at the close of the business on July 16th the brokerage firm had a credit balance of $175.97, and from the books it appears that on the 17th of July checks of Cameron Currie & Co. drawn against their account were paid amounting to $74,963.11, leaving a balance to the credit of the firm on the books of the bank at the close of business on that day of $1,181.67. There is no question that in the instant case, in accordance with the terms of the contract entered into between the bank and the brokerage concern, checks were credited conditionally, and, if they were not found good at the close of business, they would be charged back to the depositor.

It seems to be a general rule that when checks or other commercial paper are deposited in a bank indorsed "for collection," or where there is a definite understanding that such is the purpose of the parties at the time of the deposit, the title to the paper remains in the depositor. See note to *Fayette National Bank* v. *Summers,* 105 Va. 689 (54 S. E. 862, 7 L. R. A. [N. S.] 694; 5 Cyc. p. 493. And the mere fact that the depositor is allowed to check against the credit does not change the import of the transaction, so as to preclude the bank from charging back the amount of credit if the check deposited is not paid. The bank may, as a matter of favor and convenience,

permit checks to be drawn against it before payment; the depositor, in the event of nonpayment, being responsible for the sums drawn, not by reason of his indorsement, the check not having ceased to be his property, but for money paid. 3 Ruling Case Law (under title "Banks"), p. 522.

This case has some of the features of the case of *In re State Bank*, 56 Minn. 119 (57 N. W. 336, 45 Am. St. Rep. 454), in which case the supreme court of that State, in an opinion written by Mr. Justice Mitchell, said:

"But, after all, the question is one of the agreement of the parties, either express or implied, from the general course of business between them. There can be no doubt that, if a draft or other paper is delivered to a bank for collection, the mere fact that the indorsement of the owner is unrestricted will not, as between him and the bank, make the latter the owner of the property.

"Neither is it conclusive upon the question of ownership of the paper that before collection the amount of it is credited to the customer's account, against which he has the privilege of drawing by check. It has been frequently held, with the approval of the best text-writers, that if paper is delivered by a customer to a bank for collection, or 'for collection and credit,' a credit of the amount to the customer before and in anticipation of collection will be deemed merely provisional, and the privilege of drawing against it merely gratuitous, and that the bank may cancel the credit or charge back the paper to the customer's account, if it is not paid by the maker or drawee. *Giles* v. *Perkins*, 9 East. 12; *Levi* v. *National Bank*, 5 Dill. 104 [Fed. Cas. No. 8,289]; *Balbach* v. *Frelinghuysen* [C. C.], 15 Fed. 675. The right of banks to do this in case of the deposit of checks on other banks, without any special contract, is generally exercised and recognized. This is inconsistent with the idea that the title to the checks passes absolutely to the bank, and is only consistent with the theory that the bank is the agent of the customer for collection, notwithstanding the credit of the latter. 2 Morse, Banks, § 586; *Hoffman* v. *Bank*, 46 N. J. Law, 604.

"Of course, in all such cases the banker, like a factor, has a lien for advances made on the faith of the paper, and consequently the claim of the customer may be modified by the state of his account. No such question, however, arises in this case; the balance of the petitioners' account, independent of these drafts, being in their favor at the time of the failure of the bank. The authorities on this subject are quite fully collated in Morse on Banking, § 573 *et seq.* See, also, Paley, Ag. 91, note; and Story, Ag. § 228, note 2."

See, also, *National Commercial Bank* v. *Miller*, 77 Ala. 168 (54 Am. Rep. 50).

Under the contract here entered into between the bank and the brokerage concern, it is clear that the bank became the latter's agent for collection of the checks, and could not, it is needless to suggest, be the owner of the paper at the same time.

It is contended, however, that, as the books of the bank disclosed that there was a credit of $175.97 at the beginning of business on July 17th, that the credit balance of the firm at the close of business on that day was $1,181.67, and the check in question amounted to $3,526.57, it is conclusive that at least a portion of the amount of the check had been drawn against, and that the bank should have a lien for at least that amount on the proceeds of the check.

The transactions in Cameron Currie & Co.'s checking account on July 17th are thus tabulated in defendant's brief:

Credit.

| | |
|---|---|
| 1. Balance .................... | $175.97 |
| 2. Deposits: Checks on the First National Bank and National Bank of Commerce. These items are all a part of the kiting operations of Currie & Co., and were upon accounts in which they had no money. | 7,000.00 |
| | 9,812.50 |
| | 3,000.00 |
| | 10,000.00 |
| | 2,000.00 |
| | 9,500.00 |
| | 8,906.25 |
| | 8,500.00 |
| 3. The check in suit........... | 3,526.57 |

4. Two drafts on Hayden, Stone
   & Co., with collateral, which
   were later satisfied out of
   the same            {    $6,500.00
                                   5,500.00
5. Miscellaneous items ........     25.00
                                   150.00
                                     7.50
                                     3.50
                                     41.66
                                     1.00
                                     10.00
                                     175.00
                                     10.00
                                 1,300.00

         Total ...................    $76,144.95    $76,144.95

                      Debit.

1. Checks payable to People's  }   $6,175.00
   State Bank, which were a        5,000.00
   part of the kiting opera-        4,673.20
   tions carried on through        6,120.00
   the National Bank of Com-      4,912.50
   merce and the First Na-       3,500.00
   tional Bank, and which        5,000.00
   plaintiff received before      6,512.50
   clearing house hours—*i. e.,*
   11:30 a. m.—July 17th

2. Checks payable to People's    2,500.00
   State · Bank, on which       3,000.00
   Fearnley testified he got     2,000.00
   cash, which was probably
   used to make good Currie's
   account at the two national
   banks before clearing house.
   There is no direct testimony
   as to when these checks
   were paid

3. Other items paid through the   70.05
   clearing house July 17th,     37.50
   and therefore certainly be-   300.00
   fore 1 o'clock                3.50
                                     221.25
                                     142.46
                                     112.50

4. Check to Matthew Finn, paid
   July 16, 1908, charged July
   17th ......................  $5,109.35
5. Items regarding time of pay-⎫     9,000.00
   ment of which there is no  ⎪       103.75
   testimony               ⎬       190.00
                           ⎪       366.25
                           ⎪        12.50
                           ⎪         1.00
                           ⎭     9,899.80
                                  ─────────

     Total ...................  $74,963.11   $74,963.11
                                              ═════════

     Credit balance ..........                $1,181.84

It is claimed that the books of Cameron Currie & Co. show that their checking account with the bank was overdrawn on that day to the amount of $59,000. On that day, as appears by the summary above set forth, by far the larger part of the entries were mere paper transactions, and were part of what is known as check and draft kiting operations, which it appears had been continued for months previous to that time. Cameron Currie & Co., who, as has been stated, were insolvent on the 1st day of July, 1907, were enabled to continue in business by transactions which are spoken of in the opinion in *Austin v. Hayden*, 171 Mich. 38, 56 (137 N. W. 317, 324), *supra*, as follows:

"During the financial depression which occurred during the latter part of 1907 they were in sore straits and resorted to irregular and dishonest practices, which were followed, when emergencies arose, until their failure. They concealed and covered up their true condition by fraudulently hypothecating securities under their control, delaying delivery by specious excuses, by a system of having commercial paper afloat, called 'kiting paper,' making overdrafts and wiring money at the last moment to cover them, and other similar expedients."

A considerable part of these check and draft kiting operations were carried on through the plaintiff bank.

Against the objections of plaintiff's counsel, who contended that it was immaterial and irrelevant, a large amount of testimony was introduced bearing upon this practice of Cameron Currie & Co. Mr. McPherson, an expert accountant, described these kiting operations, so far as they are applicable to this case, as follows:

"Cameron Currie & Co. would deposit in the People's State Bank checks drawn upon the National Bank of Commerce and the First National Bank. Those checks would go through clearings, and so far as I recall, until the morning of the 18th day of July, all such checks were honored by the bank upon which drawn. I mean paid by the bank upon which drawn. Currie & Co. would deposit in the First National Bank and the National Bank of Commerce drafts which they had obtained by purchase from the People's State Bank, and for which they had given their checks to the People's State Bank. That would make up a part of their deposits. The balance of their deposits would be made up of regular transactions, checks from customers and drafts on various brokers. I determined that to the extent that the checks or that the drafts that were purchased from the People's State Bank were deposited in either of the other two banks, to that extent, with all the knowledge I had before me, they were kiting transactions. * * * Generally speaking, by kiting checks I mean any method which produces a temporary credit by the exchange of checks or by the making of drafts where the money has been later forwarded to pay those drafts, or by depositing of checks where the money to meet the checks has been later deposited to meet the checks before they go through clearings. Transactions of that sort I would regard as kiting transactions."

In an effort to establish the giving of value for the check in controversy, the plaintiff itself introduced a large number of drafts and checks which were largely made up of these kiting transactions; and it seems to us to have been perfectly proper to allow the defendant to show the real nature of these paper trans-

185 Mich.—37.

actions, and that they in fact represented nothing but illegal transactions on a gigantic scale. *Detroit National Bank* v. *Trust Co.*, 145 Mich. 656 (108 N. W. 1092, 116 Am. St. Rep. 319).

It is the contention of the defendant and appellee that these illegal transactions and the fictitious credit that was being given by the bank to Cameron Currie & Co. were known to the bank and permitted by it to continue. We think that such knowledge is conclusively shown by the testimony of Mr. Robert Mason, who was an assistant cashier of the bank, and whose duty it was, under a special assignment, to look after the account of Cameron Currie & Co. and see that they did not overdraw their account. With reference to the kiting operations, he testified in part as follows:

"*Q.* Who was it that turned this account over to you to handle—what officer of the People's State Bank?

"*A.* Mr. Potter.

"*Q.* What position did he occupy?

"*A.* He was vice president.

"*Q.* In short, Mr. Mason, Cameron Currie & Co., through the People's State Bank, First National Bank, National Bank of Commerce, and Hayden, Stone & Co., for a year were engaged in what is commonly known among bankers as check kiting, were they not, and draft kiting?

"*Mr. Keena:* I will object to that as immaterial and irrelevant.

"*The Court:* I will take an answer. Note an exception.

"*A.* I don't know how long.

"*Q.* Well, for six months previous to July 17, 1908?

"*A.* I don't remember how long.

"*The Court:* Under your plea you don't go back any farther than six months, do you, if you go back that far. I have forgotten.

"*Q.* They were engaged in this practice on the 17th day of July, were they not?

"*A.* Yes, sir.

"*Mr. Keena:* That is objected to as immaterial. (Objection overruled. Plaintiff excepts.)

"*Mr. Keena:*   All of this testimony is received under objection.

"*The Court:*   Yes.

"*Q.* They were engaged in it on the 16th day of July, were they not?

"*A.* I think so.

"*Q.* On the 15th?

"*A.* I guess so.

"*Q.* Well, it extended back for a period of at least six months, did it not?

"*A.* I don't remember how far back.

"*Q.* What does check kiting and draft kiting mean in banking?

"*A.* Am I supposed to explain that?

"*Q.* Yes; just shortly, what does it mean?

"*A.* A man will draw a check upon a bank where he hasn't any funds, and then next day, when the check comes in, he draws a check upon the bank that he originally deposited the first check in to take care of the first one, the second one not coming to the clearing house until the third day.

"*Q.* Then what?

"*A.* Then you deposit another one. It just kind of keeps up an endless chain. It is hard to explain it.

"*Q.* What is the effect of it; what is it done for?

"*A.* You get the use of money for a day.

"*Q.* Does it result in a fictitious credit appearing upon the books of the bank?

"*A.* I should say yes.   *   *   *

"*Q.* You don't mean to have it appear here that on the 17th day of July these unpaid checks and drafts that came into the bank afterwards, that those were the beginning of those transactions, do you? You don't mean that?

"*A.* That isn't what I said.

"*Q.* You know that the history of those transactions dates back months, don't you?

"*A.* I don't remember how long.

"*Q.* It dates back from the time you had your talk with Case, doesn't it?

"*A.* I don't remember.

"*Q.* It commenced about that time, didn't it, when Case had his talk with you?

"*A.* I don't remember.

"*Q.* And stated to you that that is why he wanted to do it, didn't he?

"*A.* Wanted to do what?

"*Q.* That the reason he asked you these favors or your bank these favors was that Hayden, Stone & Co. were having their books examined, and that he thought that they would put $250,000 into the business as capital.

"*A.* He made that statement to me; yes.

"*Q.* If it had not been for that statement, you would not have allowed this to go on, would you?

"*A.* No; I don't think I would.

"*Q.* Why wouldn't you have allowed it to go on?

"*A.* Well, I wanted to know something about their affairs.

"*Q.* You would not allow any customer to do that, would you, excepting for some promise of that kind?

"*A.* No; not without any security.     *     *     *

"*Q.* You say that Mr. Case stated to you that they were going to get additional capital of how much?

"*A.* I believe the amount was $250,000, according to my best recollection.

"*Q.* How long before the failure did you have a talk with him on that subject?

"*A.* It was some time previous.

"*Q.* Did he show you any communications he received with reference to it from Mr. Currie or anybody?

"*A.* I recall he showed me a telegram at one time.

"*Q.* When was that?

"*A.* It was some time previous to the failure. I don't remember just when.

"*Q.* You don't know how long?

"*A.* No, sir.

"*Q.* But did you have several conversations with him when he would come in at different times?

"*A.* Oh, yes; almost every day.

"*Q.* When he would ask to have dishonored drafts taken up by new drafts, would you have a conversation with him about the additional capital? Would he tell you something about it?

"*A.* He mentioned that at various times.

"*Q.* I guess that is all."

Cross-examination by Mr. Groesbeck:

"*Q.* But he never brought in the $250,000, did he?

"*A.* No, sir.

"*Q.* And it dragged along for months in that stage, that he was coming to you and talking to you about something that they were going to get; showed you a telegram?

"*A.* I won't say months, Mr. Groesbeck. I couldn't say exactly the time.

"*Q.* Well, Mr. Mason, you said here it was some time in the spring. Fix it by Decoration Day, say.

"*A.* Somewhere in that neighborhood I guess.

"*Q.* It was before Decoration Day, wasn't it?

"*A.* Well, I could not state. It was around. that neighborhood some time, along in the spring.

"*Q.* You don't know of any other concern that the People's State Bank was loaning a hundred or one hundred sixty-two thousand dollars to upon a statement that somebody was going to put a couple of hundred thousand dollars in their business, do you?

"*A.* I don't recall any."

It thus conclusively appears: That Mr. Mason had knowledge of the kiting operations of Cameron Currie & Co. with the bank as early as Decoration Day of 1908, and that these operations were allowed to be continued by him as an officer of the bank because he had been told by Mr. Case that Hayden, Stone & Co. were auditing the books of Cameron Currie & Co. and expected to put $250,000 of additional capital into that business. That the bank, through Mr. Mason, well knew and understood that Cameron Currie & Co. were agents buying and selling for customers and owners generally on commission, there can be no question, and also that he had knowledge of the fraudulent credits extended to them, and the fact of their insolvency. The defendant put on as witnesses, with reference to the bank's transactions with Cameron Currie & Co., certain of its clerks and tellers, but no officer of the bank took the stand who testified authoritatively to the real relations existing between the bank and Cameron Currie & Co.

After a careful examination of the record with reference to these various transactions, we are unable to say, from the proofs, what the real condition of this checking account was at the time of the deposit of the check, and are satisfied that a great amount of the transactions that entered into this checking account were not legitimate banking transactions, and were not carried on in the ordinary course of banking business; and that these transactions were consented to by the officer of the bank in charge of this account. We do not believe that, under these circumstances, it should be said, or that it can be said, that the bank (it having consented and permitted Cameron Currie & Co. to do business in this illegal way) was a *bona fide* holder of this check for value, and therefore agree with the trial judge in holding that the plaintiff had not met the burden placed upon it to show this, and its case against the defendant must therefore fail.

Neither are we of the opinion that the defendant has by his conduct in the case of *Austin* v. *Hayden, supra,* in which he appeared as an intervener, estopped himself from setting up fraud as a defense in this case. To so hold was not the purpose of this court in the opinion written by Mr. Justice BROOKE in the case of *Austin* v. *Hayden,* 176 Mich. 331 (142 N. W. 563). While, under this opinion, Hayden, Stone & Co. might have defended this action, nevertheless it appears that they did not so defend and the defendant did.

We find no error, and the judgment is therefore affirmed.

BROOKE, C. J., and McALVAY, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.