**The People of the State of Illinois ex rel. Andrew Russel v. Michigan Avenue Trust Company.**
**Studebaker Corporation of America et al., Intervening Petitioners, Appellants, v. John W. O'Leary, Receiver of Michigan Avenue Trust Company, Appellee.**

### Gen. No. 30,496.

1. BANKING—*recovery of identifiable deposits accepted by bank after knowledge of insolvency.* Acceptance of deposits by bank when its managing directors know it is hopelessly insolvent, is such fraud on depositors as entitles them to reclaim their deposits.

2. BANKING—*acceptance of deposits during insolvency known only to officer responsible therefor, as fraud of bank.* Insolvency, solely known to and caused by one officer of a bank, does not make it fraud on the part of the bank to accept deposits after such insolvency.

3. BANKING—*assent of directors to exclusive control of bank by president as affecting liability for deposits accepted after insolvency.* Where bank directors gave president exclusive control of bank's management, liability of bank for deposits accepted after insolvency was not affected by fact such condition was solely known to and caused by acts of such president.

4. BANKING—*sufficiency of evidence to show fraud of bank in accepting deposits while insolvent.* Evidence in suit to recover deposits made in an insolvent bank held to show such knowledge of the bank's condition during three days preceding its closing on the part of the president, vice president and cashier thereof as to render fraudulent the acceptance of deposits during such period.

5. BANKING—*title of bank as to paper accepted for immediate credit subject to right to charge back if unpaid.* Where a depositor is given immediate credit for paper deposited, subject to the right of the bank to charge back if not paid, the title to such paper passes to the bank, in the absence of any agreement to the contrary.

6. BANKING—*title of bank as to paper accepted under special agreement for collection.* Where a bank accepts paper from a depositor under a special agreement recited in pass-book establishing relation of agency for collection only, such agreement is binding as between the parties, and leaves the title to such paper, as between them, in the depositor.

7. BANKING—*printed notice on pass-book or deposit slip as evidence of special agreement respecting title to deposited paper.* Printed notice on bank pass-book or deposit slips furnished to depositor held competent and material evidence as to contract between parties respecting title to paper accepted for deposit.

8. NEGOTIABLE INSTRUMENTS—*rights of holder in due course as affected by agreement respecting title as between bank and depositor.* Rights of third parties, holders in due course without notice, are not affected by agreement between bank and its depositor whereby bank assumes responsibility as agent for collection only.

9. BANKING—*when special agreement affecting bank's title to deposited paper not waived.* Evidence in an action to recover paper deposited in insolvent bank held not to show waiver by bank of rights under special contract whereby it assumed responsibility of agent for collection only.

10. BANKING—*when evidence insufficient to show identification of individual deposits in insolvent bank.* Balance in one bank on collections for another, made up of advances by first bank as well

as collection items, held subject to too. many claims to permit identification of individual deposits made in second bank after its insolvency.

Appeal by intervening petitioners from the Circuit Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1925. Reversed and remanded with directions. Opinion filed December 21, 1926.

McCORMICK, KIRKLAND, PATTERSON & FLEMING, HARRIS F. WILLIAMS & H. M. PIERCE and WINSTON, STRAWN & SHAW, for appellants; HAROLD BEACOM and LOUIS G. CALDWELL, of counsel.

DEFREES, BUCKINGHAM & EATON, for appellee; MATTHEW MILLS and TRACY WILSON BUCKINGHAM, of counsel.

MR. JUSTICE FITCH delivered the opinion of the court.

This appeal is from a decree in a receivership proceeding, dismissing for want of equity the intervening petitions of 157 depositors, who sought to recover in full deposits made by them in the Michigan Avenue Trust Company, a State bank, on the last day it was open for business, and, in some cases, deposits made before the last day. The petitions and answers of the receiver were referred to a master in chancery, who heard the evidence and reported his conclusions, which, for the most part, were favorable to the petitioners. Exceptions to the master's report were sustained by the court and thereupon the decree appealed from was entered.

The Michigan Avenue Trust Company was organized under the Laws of Illinois in October, 1910, with a capital stock of $200,000. It was closed by the State auditor on the morning of July 21, 1921, and about a month later, a receiver was appointed on a bill filed by the auditor. At the time it was closed, the bank

had deposits aggregating approximately $3,500,000, and its books showed a surplus of $50,000 and undivided profits of about $39,000. In his bill, the auditor states (and the statement is borne out by undisputed evidence) that among the assets shown on the books of the bank at that time there were "doubtful, worthless and missing assets" aggregating over $1,500,000, and it is clear from the evidence that because of that fact, the bank was then, and for a long time prior thereto had been, hopelessly and irretrievably insolvent, and that this condition was not only fully known to its president, but was brought about mainly by his defalcations and forgeries. Whether such condition of insolvency was known to any other officer or director of the bank is the main question of fact involved on this appeal. Upon this question, the master found that the cashier, Clarence A. Beutel, who was also a director, "knew of the aforesaid state of insolvency from at least as early as the hour of 9 o'clock a. m., July 18, 1921" (three days before the failure), and that the vice president, John A. Conrad, who was also a director, had "knowledge of facts indicating the aforesaid state of insolvency continuously since July 15, 1921." The decree sustains the exceptions of the receiver to these findings and specifically finds that no officer or director of the bank, except the defaulting president, "had knowledge of the insolvency of said bank until after said bank closed for business," and that the president's knowledge of the bank's insolvency is not imputable to the bank because notice to an agent is not notice to his principal where the agent is acting "in breach of his trust" and it is to his personal interest to conceal the information from his principal.

Petitioners claim, first, that the bank's condition of hopeless insolvency was actually known to the president, vice president and cashier (who were also directors of the bank), for a period of at least six days before the bank was closed by the auditor; that, be-

CHICAGO—FIRST DISTRICT—DECEMBER, 1926. 583

The People v. Michigan Avenue Trust Company, 242 Ill. App. 579.

cause of such knowledge on the part of its officers, the bank was guilty of fraud in accepting deposits from the petitioners during that period, and that on account of such fraud the petitioners are entitled to rescind the transactions and recover their deposits in so far as the same can be traced or identified; second, that as to all *checks* deposited in the bank the relation between the depositor and the bank was that of principal and agent, and not creditor and debtor, until the proceeds of such checks were received by the bank; that until then, the title to the checks and the proceeds thereof remained in the depositor; that in all cases where such checks were not collected, or where, if collected, the proceeds had not been received by the Michigan Avenue Trust Company when it was closed, the depositors are entitled to a return of the checks or the proceeds thereof. The receiver contends, as to the first claim, that as a matter of law the defaulting president's knowledge of the bank's insolvency cannot be imputed to the bank, and that as a matter of fact, no other officer or director had any knowledge of such insolvency prior to the closing of the bank; and contends, as to the checks of petitioners, that the relation between the bank and petitioners was the usual relation of debtor and creditor, and also that in any event, except for the last-day deposits, such checks or their proceeds cannot be traced into the receiver's hands.

*First,* as to the claim of fraud in accepting the last day's deposits. The rule is well settled that the acceptance of deposits by a bank at a time when, to the knowledge of its managing officers, it is hopelessly insolvent, is a fraud upon the depositors such as will entitle them to rescind the transactions and reclaim their deposits, so far as they can be identified. (*St. Louis & S. F. Ry. Co. v. Johnston,* 133 U. S. 566, 576; *Cragie v. Hadley,* 99 N. Y. 131; *Orme v. Baker,* 74 Ohio St. 337; *Knaffl v. Knoxville Banking & Trust*

*Co.*, 130 Tenn. 336; *American Trust & Savings Bank v. Gueder & Paeschke Mfg. Co.*, 150 Ill. 336; *Board of Sup'rs of Lunenburg Co. v. Prince Edward-Lunenburg County Bank*, 138 Va. 333, and notes in 20 A. L. R. 1206, and 37 A. L. R. 604.)

To this rule, an apparent exception is recognized in cases where the condition of insolvency was caused by and known only to a defaulting officer of the bank. (*Perth Amboy Gaslight Co. v. Middlesex County Bank*, 60 N. J. Eq. 84, 45 Atl. 704; *First Nat. Bank of Hancock, Md. v. Aler*, 92 W. Va. 313, 114 S. E. 745; *Fidelity & Deposit Co. of Maryland v. Kelso State Bank*, 287 Fed. 828.) This exception, and the reason for it, are stated as follows in *Merchants' Nat. Bank of Peoria v. Nichols & Shepard Co.*, 223 Ill. 41, 53: "To the general rule that notice to the agent is notice to the principal there is a well defined exception, that notice will not be imputed to the principal where the facts authorize the inference that the agent will conceal the information. That is the presumption where it would be detrimental to the agent's interests to disclose the facts."

It is generally held, however, that where the directors have authorized or permitted a defaulting officer to have the entire management and control of the bank, the exception thus stated does not apply, for in such cases, he is the bank, in effect, and therefore his knowledge is that of the bank. (*Orme v. Baker, supra; Eastin v. Bank of Harrisonville*, 213 Mo. App. 130; *Mays v. First State Bank of Keller* (Tex.), 247 S. W. 845; *First Nat. Bank of Morristown, Tenn. v. C. W. Leeton & Bro.*, 131 Miss. 324, 95 So. 445; *Cragie v. Hadley, supra; St. Louis & S. F. Ry. Co. v. Johnston, supra; Wasson v. Hawkins*, 59 Fed. 233; *Pennington v. Third Nat. Bank of Columbus, Ga.*, 114 Va. 674, and 29 L. R. A. (N. S.) 558 note, where the cases on this subject are collected.)

It is clear from the evidence that for at least a year
before the failure the directors of the Michigan Ave-
nue Trust Company had permitted the president to
run it as he saw fit.   He was in full control and was
the active manager.   The books show that there were
directors' meetings, but during the last year, at least,
such meetings appear to have been called by the pres-
ident for the sole purpose of ratifying his acts, which
was done without question.

Under these circumstances, if the evidence failed to
show that any other officer or director had knowledge
of the bank's condition of insolvency, we should be
inclined to hold that the situation here was similar to
that in *St. Louis & S. F. Ry. Co. v. Johnston, supra,*
where the court said: "This bank was hopelessly in-
solvent when the deposit was made, made so apparent-
ly by the operations of a firm of which the president
of the bank was a member.   The knowledge of the
president was the knowledge of the bank."

However, in the view we take of the facts of this case,
it is unnecessary for us to determine whether the
knowledge of the president alone was, of itself, suffi-
cient to make the bank's acceptance of petitioners'
deposits a fraud upon them.   We think the clear pre-
ponderance of the evidence shows that in addition to
the president, the vice president and the cashier also
had actual knowledge of the insolvency of the bank
for months before the failure, and that the vice pres-
ident, as early as July 15, 1921, and the cashier, as
early as July 18, 1921, knew that the insolvent condi-
tion of the bank had then become hopeless and ir-
retrievable.   The following is a statement of the per-
tinent facts and circumstances in evidence on this
subject.

The president, Warren C. Spurgin, was born on a
farm near Panora, a small village located in Guthrie
county, Iowa, and grew up in that vicinity.   He had
some banking experience as cashier of the bank at

Panora, of which his uncle, George M. Reynolds, who later became president of the Continental and Commercial National Bank of Chicago, was at one time cashier and manager. In 1914, through the influence of his uncle, Spurgin obtained employment with the Michigan Avenue Trust Company as assistant cashier. He bought some stock in the company, and thereafter became, in succession, its cashier, vice president, and, in 1919, its president. In March, 1917, while he was cashier, he committed the first of a series of forgeries. He forged the name of David Hopkins, a retired farmer living at Panora, to a 5-year mortgage for $25,000, and caused entries to be made on the Trust Company's books showing that this mortgage had been purchased by it at that time. To pay for it, he drew a cashier's check, payable to the Guthrie County National Bank at Panora, Iowa, and deposited the same to his personal account in that bank. A month later, he caused the Trust Company to discount a note for $15,000 forged by him, purporting to be signed by one Hart, who had formerly lived in Panora, and to credit the proceeds to a checking account which he opened in Hart's name, all of which he drew out later on forged checks. In like manner, from time to time during the following four years, Spurgin caused the Trust Company to purchase many similar forged mortgages and to discount many similar forged notes for large sums, usually $20,000 or $25,000, purporting to be signed by persons who lived, or had lived, in or near Panora. The proceeds of some of these forged mortgages went to Spurgin's credit at the Guthrie County Bank at Panora, and the interest on the mortgages as it fell due was paid by his check on that bank. The proceeds of the rest of such forged mortgages and of the forged notes were credited to accounts opened by Spurgin in the Michigan Avenue Trust Company, in the names of the fictitious signers of the notes, and paid out on their purported checks forged by him. On July 15,

1921, more than 50 of these forged notes and mortgages, aggregating $1,054,988.33, had accumulated in the bank. Among them was a note for $37,500 purporting to be signed by Spurgin's daughter, and another for $15,000 to which he had forged his brother's name. Usually, when a fictitious account was opened by him in the manner above indicated, the forged note was accompanied by a "financial statement" and "signature card" of the fictitious maker, both written by Spurgin. In some instances, the financial statement thus filed contained nothing more than the signature of the fictitious maker. None of the mortgages was ever recorded.

During the four years in which Spurgin, in this fashion, abstracted over a million dollars from the bank's funds, Conrad and Beutel occupied positions in the bank, the duties of which required them to see, and often to handle, these forged notes and mortgages. In September, 1920, Conrad became vice president, and Beutel cashier, and both were elected directors. The evidence shows that the forged notes were kept in a note-pouch to which both had access at all times. Conrad testified that "generally, the cashier got the pouch out of the vault every morning and put it on his desk to check the maturity dates of paper approaching maturity," and that "we would all do that, the president, vice-president and cashier." The chief clerk testified that, ordinarily, the financial statements would go to Beutel, and when a note was to be renewed, Conrad would O. K. the renewal note and then it would be filed in the note-pouch. Some of the notes were inclosed in envelopes, upon the outside of which Conrad wrote the name of the maker and the maturity and interest dates. Beutel testified that every note that came into the bank found its way into the note-pouch, whether the note was taken by Spurgin, Conrad or himself; that he carried the pouch out of the vault every morning and kept it on his desk; that the mort-

gages were ordinarily kept in the vault and he saw and handled them when interest coupons were cut off, and at other times. The coupons were cut off by Beutel, who put them on Spurgin's desk, and the latter paid for them with his personal check. Both Conrad and Beutel were well acquainted with the handwriting of Spurgin. On the witness stand Beutel identified many notes, checks and other documents written or signed by Spurgin. Beutel told Mr. Reynolds, before noon on July 18, 1921, that "he was sure" many of the notes and mortgages on which Spurgin paid the interest were "phony"—meaning forged. James I. Ennis, a handwriting expert with a long experience as a paying teller in a Chicago bank, testified that the forgeries were so obvious that, in his opinion, anyone familiar with Spurgin's handwriting would at once recognize the signatures as having been written by Spurgin.

It further appears that among the bank's assets at the time it was closed were notes aggregating $455,500, representing loans to the Graff Manufacturing Company, a concern which manufactured automobile bodies, and which (according to the testimony of a public accountant) had been hopelessly insolvent for months prior to July, 1921. On July 14, 1921, Beutel was sent to New York by Spurgin, ostensibly to see what could be done towards collecting a recent overdraft of $56,000 by that company, and while there he ascertained that the overdraft could not be paid. It is a fair inference, from this and other evidence as to that loan, that Beutel then knew that it was a desperate, if not uncollectible, asset. That loan was for more than twice the capital stock of the bank.

The evidence further shows that Spurgin was the owner of, or interested in, five or six oil and mining companies of little worth, which were heavy borrowers from the bank. Conrad was an officer of at least two of these companies, and Beutel testified that he knew

that fact.   Beutel also testified that about the middle of June, 1921, he discovered that the bank was carrying as assets two notes, aggregating $38,000, which had been given to Spurgin "for an interest in an oil deal," but which had been settled or paid and should have been destroyed or returned to the signers, and on July 1, 1921, he spoke to Spurgin about these notes, and took occasion at the same time to object to Spurgin's taking notes from his own oil and mining companies, to which Spurgin replied that he did not feel that Beutel was in a position to say what loans Spurgin should or should not make; that thereupon Beutel tendered his written resignation, to take effect July 15, and at once told A. B. Sherwood and Henry Paulman, two of the directors, the facts regarding the Graff Manufacturing Company loan, and the two notes last above-mentioned, and the loans made by Spurgin to his own companies.   Beutel testified that when he told them about the Graff loan, he used the term "crooked." Sherwood suggested that an audit of the books be made.   Spurgin at first refused to pay the expense of such an audit, but finally after a talk with Mr. Reynolds, whose aid was enlisted by Paulman, he agreed to have an audit made on July 15.   On that day, he disappeared carrying with him, as we understand the record, at least $125,000 in large bills of the bank's money, taken from the paying and receiving teller's cages on that day.

Meantime, he had apparently endeavored to destroy the evidence of his forgeries.   On July 6, 1921, he took from the vault the forged notes of his brother and daughter, and put in their place an equal amount of bonds of one of his doubtful enterprises.   On July 11, he took from the vault five forged notes aggregating $94,500, and put in their place several thousand shares of "Hawkeye Oil" preferred stock and 1,000 shares of "Consumers' Service Station" preferred stock. The envelope in which the latter stock was filed con-

tained a description of the stock in Conrad's handwriting. On July 14, Spurgin took from the bank other forged notes, aggregating $67,800, and replaced them with worthless bonds of mining and oil companies in which he was interested. One of the debit slips from which this transaction was entered on the books bore the "O. K." of Conrad. On July 15, while Beutel was in New York, Spurgin took from the bank the rest of the forged notes above-mentioned, and forged farm mortgages totaling about $75,000, and put in their place worthless bonds having a par value of $664,000 issued by three of his oil and mining companies. All but $100,000 par value of these bonds were dated July 1, 1921. They had just been printed. Conrad was named as trustee in some of them and Spurgin in others. At the same time, 29 fictitious bank accounts, which had been opened by Spurgin, in the manner above stated, were closed out and the balances, together with the bonds above-mentioned, were ostensibly used (as shown by the books) to pay for the notes and mortgages which they replaced, aggregating over $800,000 in face value. The rest of the forged farm mortgages were also then taken out, and "trust receipts," signed by Spurgin, were substituted.

Conrad discovered these bonds in the vault the evening of July 15. He examined them but said nothing to anyone at that time. The next day he received a letter from Spurgin, written on the stationery of a Chicago hotel, stating that he "was going out of town," but would be back the following Wednesday (July 20), and asking Conrad to send the books of one of his mining companies to the superintendent in Ouray, Colorado, which Conrad did immediately.

On Monday morning, July 18, 1921, Beutel returned from New York, having been absent since the 14th. He went to the bank, and as he was looking through his mail, Conrad told him that Spurgin had put into the bank about $600,000 worth of mining and oil com-

pany bonds, in which he, Conrad, was named as trustee, but of which he knew nothing. Beutel looked at the bonds in the vault. He testified that "because of the exceptional amount of the issues and knowing Spurgin's interest in these companies, but without knowledge of the financial ability of the companies, I felt they were not the kind of stuff for investment by a bank, from a liquid standpoint, and I told Conrad to *take care of the ship* while I conveyed this information to my directors." He immediately carried his information to Sherwood and Paulman. One of them suggested talking the matter over with Reynolds, and that was done at once.

According to Reynolds' testimony, he was then informed by Beutel that Spurgin had gone away, leaving a letter saying he would return on the 20th, and had taken out of the bank a large amount of notes, which he "was sure were phony," and $175,000 in mortgages on farms in Guthrie county, Iowa, which he "was afraid were not all right," and had substituted $650,000 in bonds of Spurgin's own companies; that he thought Spurgin had sent him away to get rid of him while he made this transfer; and that the bonds had been printed while he was away. He gave Reynolds a list of the notes which had been taken away and showed Reynolds some of the forged checks *which* (Beutel said) *"he thought were all signed by Spurgin."* Reynolds told Beutel to ascertain at once what value there was, if any, back of the bonds, "because upon that hinged the whole question of the solvency of his bank." Reynolds said that he could and would ascertain whether the farm mortgages were good, as the names on them were those of men he had known when he lived in Panora. During that day and the next, Reynolds made inquiries which satisfied him the mortgages were forged, and about noon on July 20, he told Beutel and Paulman so. He asked them what they had found out regarding the bonds. Beutel re-

plied that "he did not know any more than he did before, *but he was of the opinion that they were not of much value.*" Reynolds then said that apart from the value of the bonds, it was evident that the bank was insolvent because of the loss on the mortgages and the Graff loan. It was arranged to have a bank examiner call at the bank the next morning, and, meantime, Reynolds advised Beutel to segregate that day's deposits "so that if the court saw fit, they could be handed back to the people who made them." Pursuant to Reynolds' advice, the deposits of that day were segregated that night by attaching to each of the deposit slips the identical checks deposited and an amount of cash, taken from the receiving teller's cage, equal to the amount of cash shown by the deposit slip. It was the custom of the bank (which was followed on that day) to have the receiving teller start out each morning with no money on hand and to keep in his cage all moneys received during the day, so that at the close of the day, all the currency received that day from depositors, and no other, was in his cage. Five checks, aggregating $1,256.30, which were received by early mail and which were at once deposited in a clearing house bank, were the only checks received that day that were not thus segregated.

The bank examiner arrived before banking hours on July 21, and ordered the bank closed. Beutel turned over to him the segregated last day's deposits and he deposited the same in a special account in the Continental and Commercial National Bank.

Both Beutel and Conrad denied on the witness stand that they knew the bank was insolvent at any time prior to the time it was closed. We think this denial is overcome by the evidence of the facts and circumstances. Beutel testified that the first information he had "that it was possible the bank was insolvent" was the time when Mr. Reynolds told him that "unless he could get better information on those bonds, the bank

was insolvent.'' He testified that conversation occurred on the afternoon of July 20. Mr. Reynolds testified that it occurred during the forenoon of July 18. We have examined the testimony of Mr. Reynolds in the record, and are convinced that his story is the more reasonable and probable. If his testimony is to be believed, and we think it is, Beutel's statements to him on the morning of July 18 show beyond question that he had full knowledge of the insolvent condition of the bank at that time. Possibly Beutel and Conrad may have hoped Reynolds would come to the rescue. There is evidence tending that way. But if so, the hope had no reasonable basis, and was dissipated, in any event, by what occurred on July 18.

We are therefore of the opinion that in the acceptance of the petitioners' deposits on July 18, July 19 and July 20, the bank was guilty of such fraud as entitled the petitioners to rescind the transactions and recover their deposits, in so far as the same can be traced or identified. We think it is clear that all the last day's deposits, except the five checks above-mentioned that came into the bank in the early mail on the morning of July 20, were sufficiently traced and identified. Those five checks, according to the evidence, were sent at once through the clearing house and thereby their identity was lost and the rights of third parties to the same intervened. It follows that all the deposits made on the last day, which were segregated and turned over in that form to the receiver, never became the property of the bank, nor of its receiver, but were and are the property of the petitioners, and they are entitled to have the same, or the proceeds thereof now in the possession of the receiver, returned to them.

*Second.* As to the claim of the petitioners concerning checks that were deposited by them prior to the last day, and which were not collected at the time the bank closed, the only real controversy between the par-

ties is as to the effect to be given to the fact that upon the inside of the cover of every pass-book issued to the petitioners was printed the following notice:

"Checks on this bank will be credited conditionally. If not found good at close of business, they will be charged back to depositors, and the latter notified of the fact. Checks on other city banks will be carried over for presentation through the Clearing House on the following day.

"This bank in receiving checks or drafts on deposit or for collection, acts only as your agent, and beyond carefulness in selecting agents at other points, and in forwarding to them, assumes no responsibility."

The part of this quotation that is material to the present question is the second paragraph. Petitioners claim that under that paragraph the bank acquired no title to checks deposited by the petitioners until they were collected, for the reason that the bank thereby expressly stipulated that it received such checks merely as the agent of the depositor for collection and not as a purchaser thereof.

Upon the general question whether the title to checks deposited by a customer of a bank to his account passes to the bank by an unrestricted indorsement of the paper deposited, the authorities are not harmonious. The cases on that subject are collected in exhaustive notes to be found in 11 A. L. R. 1043, 42 A. L. R. 492, and 47 L. R. A. (N. S.) 552. Petitioners' counsel concede that the majority view is that where a deposit of that kind is made and immediate credit is given to the depositor, subject to the right on the part of the bank to charge back any check or draft that is not paid, the title to the paper passes to the bank, and the relation thereby created between the bank and the depositor is that of debtor and creditor, in the absence of any agreement to the contrary. This rule is recognized in Illinois in the following cases: *American Trust & Savings Bank v. Gueder & Paeschke Mfg. Co.,*

*supra; Doppelt v. National Bank of the Republic,* 175 Ill. 432; *American Exch. Nat. Bank v. Loretta Gold & Silver Min. Co.,* 165 Ill. 103, and *Anderson v. Keystone Chemical Supply Co.,* 293 Ill. 472. But it is contended by petitioners, and we think correctly, that where there is an agreement between the depositor and the bank, such as is indicated by the printed provision in petitioners' pass-books, the agreement is binding on the parties to it, and as between themselves, the bank becomes merely the depositor's agent, the title to the paper remaining in the depositor. This was the view taken by the Appellate Court of this district in *Chicago Title and Trust Co. v. Household Guest Co.,* 88 Ill. App. 126, and in *Home Bank & Trust Co. v. Bogorad,* 242 Ill. App. 16.

So far as we are advised, this precise question has not been before the Supreme Court of this State. In other States, there is no dissent from the general proposition that the question is fundamentally one of intention (11 A. L. R. 1045), to be determined by the facts and circumstances surrounding the deposit, and among such facts and circumstances, the authorities generally regard a printed notice in the depositor's pass-book, or on the deposit slips, as very material, if not conclusive evidence of such intention. (*In re State Bank,* 56 Minn. 119; *South Park Foundry & Machine Co. v. Chicago Great Western Ry. Co.,* 75 Minn. 186; *King v. Bowling Green Trust Co.,* 145 App. Div. 398, 129 N. Y. Supp. 977; *Spooner v. Bank of Donaldsonville,* 144 Ga. 745; *First Nat. Bank of Blanchester v. Stengel,* 169 N. Y. Supp. 217, affirmed without opinion in 185 App. Div. 906, 171 N. Y. Supp. 1085, which is also affirmed in 227 N. Y. 659; *People's State Bank v. Miller,* 185 Mich. 565; *In re Jarmulowsky,* 249 Fed. 319; *Old Nat. Bank of Spokane v. Gibson,* 105 Wash. 578, 179 Pac. 117.)

In a number of cases cited by counsel, where the rights of third parties, who had become holders in due

course without notice, were involved, such an agreement between the bank and its depositors was either disregarded or held not to prevent the title to the paper from passing to the bank. As this suit is between the original parties, however, such cases have no bearing upon the question here involved. This distinction is recognized in terms, in *National Bank of Commerce v. Bossemeyer*, 101 Neb. 96.

Four cases only are cited by counsel for the receiver as holding a different view from that of the authorities above cited. Two of such cases, viz.: *Amalgamated Sugar Co. v. United States Nat. Bank of Portland, Oregon*, 187 Fed. 746, and *Plumas County Bank v. Bank of Rideout, Smith & Co.*, 165 Cal. 126, 131 Pac. 360, are in the category last above-mentioned of cases in which the rights of third parties without notice had intervened and are, therefore, not in point. The third is *Los Angeles Inv. Co. v. Home Sav. Bank of Los Angeles*, 180 Cal. 601, 182 Pac. 293. In that case, a depositor sued his own bank to recover money obtained from the bank by his employee by means of forged drafts. There was a printed provision in the pass-book requiring the depositor to examine his canceled checks within ten days after they were returned to him, and the bank defended on the ground that plaintiff had not done so. The court said that this provision came "within the category of traps for the unwary," and that in the absence of any evidence showing that it was particularly called to the attention of the depositor, it could not be "given effect as a contract binding upon the depositor and changing in a substantial particular the relation which *presumably* he thought he was entering into." This conclusion, which gives more effect to a supposed presumption than to what appears to have been the contract between the parties, is opposed to the general current of authority. But even if it were not, the case is not in point here. A depositor might complain, perhaps, that

such a notice printed in his pass-book was "a trap for the unwary," but certainly the bank who prepared it and caused it to be printed in the pass-book could not be heard to say it was trapped. The other case cited is *Summers v. Hibbard, Spencer, Bartlett & Co.*, 153 Ill. 102, where it was held that the words "All sales subject to strikes and accidents," printed in small type at the top of a letterhead, formed no part of a letter, written upon such letterhead, accepting without qualification an unconditional offer. There the court found, as a fact, that the contract between the parties was evidenced by the written offer and written acceptance, with which the printed letterhead was inconsistent. Here the best evidence of the contract is the printed stipulation in the pass-books, and nothing inconsistent therewith is shown by the evidence. It was, of course, not incumbent on the petitioners to prove that the printed notice in their pass-books was particularly called to the attention of the bank which wrote it and put it there.

Counsel for the receiver argues that the agreement shown by the pass-books was disregarded by the parties and thereby waived. We do not so understand the evidence. While it appears that immediate credit for the amount of out-of-town checks deposited was given in most cases, and depositors were permitted to draw against such credits before the checks were actually collected, such facts alone are not sufficient to show that the parties intended to abandon their express agreement. (*First Nat. Bank of Blanchester v. Stengel, supra; St. Louis & S. F. Ry. Co. v. Johnston, supra.*) On the other hand, the evidence shows that the bank availed itself of the pass-book provision whenever it was to its advantage to do so. On one occasion, a few months before the bank closed, seven checks deposited by one of the petitioners were lost in a mail robbery, and the bank, through Beutel, its cashier, notified the depositor that it had charged back

598 APPELLATE COURTS OF ILLINOIS.

The People v. Michigan Avenue Trust Company, 242 Ill. App. 579.

the seven checks to the depositor's account, and when asked why this was done, replied that the checks were received for collection only and the bank was acting only as the depositor's agent, and therefore the depositor must bear the loss. The receiver points out that it appears from Beutel's testimony that when checks were deposited at the collection window instead of the receiving teller's window, no credit was given until the checks were paid. This is true, but as we understand his testimony, the collection teller's transactions referred to—constituting about one per cent only of the total deposits—were confined to checks that were deposited for some special purpose or account, such as for collection and remittance, or for certification and return.

A more serious question arises, however, when we come to consider whether the proceeds of the checks of petitioners which were collected after July 20, 1921, have been traced by the evidence into any fund now in the receiver's hands. The evidence shows that it was the practice of the Trust Company to clear its Chicago checks through the Continental and Commercial National Bank and to clear its out-of-town checks through either the Cedar Rapids National Bank of Cedar Rapids, Iowa, or the Hanover National Bank of New York City, under agreements with those banks similar to that of the Trust Company with its depositors. When such checks were received by those banks from the Trust Company, they were immediately credited to the account of the Trust Company and the latter drew against the same, often before the checks were collected, its drafts for large, even amounts payable to the Continental and Commercial National Bank, and deposited such drafts in that bank to meet its Chicago clearing house obligations. It appears that the books of the Cedar Rapids bank showed a credit balance at the close of business on July 20, 1921, of $139,125.59. That balance, however, did not represent the proceeds

of *collected* checks, but represented the amount which would be due thereafter to the Trust Company when all the deposited checks had been collected. Most of the balance so shown on the books represented checks that were then in the course of collection, but not in fact collected at that time. During the last five days the Trust Company did business, it deposited with the Cedar Rapids bank in this manner checks aggregating $367,880.60, and during the same five days, the Cedar Rapids bank paid out on drafts of the Trust Company, to the Continental and Commercial National Bank, $420,000. On July 19, the Cedar Rapids bank received from the Trust Company a deposit of checks aggregating $78,881.86, which was at once credited to the account of the Trust Company, and on July 20, in like manner, the Iowa bank received from the Trust Company a deposit of checks aggregating $53,789.09. Most, if not all, of the checks included in these last two deposits, and doubtless many of the checks included in the deposits of a day or two before July 19, were in process of collection, but not in fact collected, when the insolvent bank closed. The account of the Cedar Rapids bank shows that on July 21, 1921, the day the insolvent bank closed (presumably on the morning of that day before the Cedar Rapids bank received notice of that fact) one of the drafts above-mentioned, amounting to $75,000, was paid by it to the Continental and Commercial National Bank, leaving a balance at that time (on the books of the Cedar Rapids bank) to the credit of the Trust Company of $63,360.61. The account also shows that after the Trust Company failed, many checks that had been deposited by the Trust Company were returned uncollected and were charged back to the Trust Company's account. On September 7, 1921, when the receiver was appointed, the credit balance in favor of the Trust Company had dwindled to $39,794.25, and that amount was paid over to the receiver. In like manner, the result of similar

deposits and credits on the account of the Hanover National Bank resulted in that bank paying over to the receiver, on September 7, 1921, the sum of $38,381.53.

It is into the balances thus received from the correspondents of the insolvent bank that some of the petitioners seek to trace the proceeds of their deposits other than the last day's deposits. Three of them introduced checks aggregating $616.67, which they had deposited on July 18 and 19, and which, as shown by the indorsements thereon, were collected by the Hanover National Bank after July 20, 1921. Fifteen other petitioners introduced checks deposited by them aggregating $36,913.10, which they had deposited during the four days immediately preceding July 20, and which, as shown by the indorsements thereon, were paid to the Cedar Rapids bank after July 20. The Western Motor Car Company, an intervening petitioner, whose petition was heard and considered with the others, but who has perfected a separate appeal, introduced like checks aggregating $2,153.10, deposited on July 19 and collected by the Cedar Rapids bank on July 21 and 22. Two other petitioners, who, after the master's report was filed, were allowed to make additional proofs, introduced canceled checks of the same character aggregating $24,357.62, deposited by them during the four business days preceding July 20, and collected thereafter *either* by the Cedar Rapids National Bank *or* by the Hanover National Bank. The record does not show how much each bank collected. By agreed orders entered of record, these additional claims were included in the master's finding and in his recommendation that all such claims be allowed as preferred claims.

The decree does not follow the master's recommendations but finds that the proceeds of these deposits cannot be traced into any fund that came into the hands of the receiver. In this respect, we think the

decree was correct. From the evidence adduced, we think it is impossible to find that the proceeds of any particular check or deposit, that was collected after the bank closed, can be traced into or identified as forming a part of either of the balances that were paid over to the receiver. It is undoubtedly true that such balances represent part of the proceeds of checks that were deposited before July 20 and collected thereafter, but it is also true that another part of such proceeds, and probably the larger part, was used by the collecting bank to repay it for the amounts it had advanced and paid, on the security of such deposits, to the Continental and Commercial National Bank. For aught that appears, the proceeds of petitioners' checks may have been the first collected and may all have been transferred in the manner above described to the last-mentioned bank in settlement of balances due to the Chicago clearing house. At any rate, the evidence leaves it very uncertain whether that is or is not the fact, and this being true, the principle announced in *Bayor v. American Trust & Savings Bank,* 157 Ill. 62, is applicable. It was there said: "It has frequently been announced as the law of this State, that even in a case where a definite and actual trust fund, which possesses all the attributes of a separate and distinct identity, has been so mixed and mingled with other funds as to render identification impossible, the *cestui que trust,* in the event of the insolvency of the trustee, is remitted to the position and the rights of a general creditor." See also *Lanterman v. Travous,* 174 Ill. 459, where the principle thus announced was followed and applied.

The petition of Frank D. McFadden and Mary McFadden must also be denied for the same reason, viz: That the proceeds of their deposit cannot be identified. The petition of Margaret Bushnell, who asks only for the return of a check which was never collected, should be allowed. The petition of D. N. Simpson should be

disallowed, in our opinion, for the reason that the proceeds of his unsigned check on another bank were mingled and dissipated in the general funds of the bank, and therefore his claim is that of a general creditor only for money had and received.

The decree of the circuit court will be reversed and the cause remanded with directions to enter a decree in comformity with the views hereinabove expressed.

*Reversed and remanded with directions.*

GRIDLEY, P. J., and BARNES, J., concur.