The People of the State of Illinois ex rel. Oscar Nelson, Auditor of Public Accounts of the State of Illinois, Complainant, v. First State Bank of Barrington, Defendant.

Hayden N. Bell and Mary F. Bell, Appellees, v. William Busse, Jr., Receiver of First State Bank of Barrington, Appellant.

Gen. No. 37,094.

Heard in the first division of this court for the first district at the October term, 1933. Opinion filed March 5, 1934.

EDWIN D. LAWLOR, for appellant; SAMUEL L. JACOBSON, of counsel.

JAMES A. SPROWL, for appellees.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

This is an appeal by Busse, receiver of the First State Bank of Barrington, from an order granting the prayer of the petition of Hayden M. Bell and Mary F. Bell filed June 29, 1933, that the balance of a deposit made by them in the bank on January 22, 1932, should be allowed as a preferred claim. The judgment order was entered on July 14, 1933. It finds in conformity with the allegations of the petition that petitioners deposited in the bank on January 22, 1932, $1,071.58 in checks drawn on Chicago banks; that at the time this deposit was received the bank was insolvent; that the officers of the bank who received the deposit knew of the insolvency and knew that the bank could not remain open longer than the close of business on January 26, 1932, and that the officers and directors took action on January 26, 1932, and delivered the assets of the bank over to the auditor of public accounts; that the deposits were collected by the bank in full and the proceeds of the deposited checks, in the sum of $978.63, were among the cash assets of the bank which came into the possession of the receiver; that the deposit

was received in trust, and that the depositors were entitled to a preference and should be paid first in full before the payment of the general depositors or other general claims. It was therefore ordered that the receiver pay the preferred claim pro rata with other preferred claims, which had been or might be allowed, prior to the payment of any general claims.

It is the contention of the receiver that the court erred in finding that the bank was insolvent when the deposit was made, in finding that the officers and directors of the bank knew of this condition and in finding that a fraud had been perpetrated upon petitioners in accepting their deposit. On the other hand, petitioners contend that the evidence shows conclusively that the bank was insolvent when the deposit was made; that the officers and directors of the bank knew it was insolvent, and that a trust arose in favor of the depositors for that reason.

As was stated by the second division of this court in *People v. Michigan Ave. Trust Co.*, 242 Ill. App. 579:

"The rule is well settled that the acceptance of deposits by a bank at a time when, to the knowledge of its managing officers, it is hopelessly insolvent, is a fraud upon the depositors such as will entitle them to rescind the transactions and reclaim their deposits, so far as they can be identified. (*St. Louis & S. F. Ry. Co. v. Johnston*, 133 U. S. 566; *Cragie v. Hadley*, 99 N. Y. 131; *Orme v. Baker*, 74 Ohio St. 337; *Knaffl v. Knoxville Banking & Trust Co.*, 130 Tenn. 336; *American Trust & Savings Bank v. Gueder & Paeschke Mfg. Co.*, 150 Ill. 336; *Board of Sup'rs of Lunenburg Co. v. Prince Edward-Lunenburg County Bank*, 138 Va. 333, and notes in 20 A. L. R. 1206, and 37 A. L. R. 604.)"

The above is a conservative statement of the general rule. In an annotation to *Forsythe v. First State Bank of Mentor*, 185 Minn. 255, 81 A. L. R. 1078, the

authorities from the different jurisdictions are cited and summarized.

·In Illinois since the act of June 4, 1879 (see Laws of 1879, p. 113) the law of this State has denounced as a criminal offense the action of any banker or broker who receives from any person or persons any money, check, draft, bill of exchange, etc., "when at the time of receiving such deposit, said banker, broker, banking company or incorporated bank is, in his or its knowledge, insolvent, whereby the deposit so made shall be lost to the depositor." The law was amended in 1903 (see Laws of 1903, p. 156) and before, as well as since the amendment (see *Meadowcroft v. People,* 163 Ill. 56) has been held constitutional and numerous cases are found in the reports of this State construing it. One of the latest is *People v. Colegrove,* 354 Ill. 164.

The theory of equity courts is that a banker by receiving a deposit represents himself to be solvent, and that if he is insolvent to his knowledge at such time, the receipt of the deposit is a fraud upon the depositor; that a court of equity in order to protect a depositor from the fraud will raise a trust *ex maleficio* and allow the depositor to follow and recover the specific money deposited so long as it can be traced.

The first and controlling question here is whether, as a matter of fact, on January 22, 1932 (when petitioners made their deposit), the First State Bank of Barrington was hopelessly insolvent to the knowledge of its officers. The deposit was made in the form of two checks which were credited to the account of the Bells, and these checks (as well as other checks received by the bank on this particular day) were indorsed by the bank and deposited by it in the usual course of business with the Central Republic Bank & Trust Co. on the following day, January 23, 1932. These checks were presented by the Central Republic

Bank at the Clearing House in Chicago on Monday, January 25, 1932, and were paid at that time by the drawee banks. The amount of the checks was credited to the account of the First State Bank of Barrington at that time by the Central Republic Bank & Trust Co. Petitioners in the meantime made certain withdrawals against their deposit so that the balance to their credit when the bank closed on January 27, 1932, was $978.63, the amount for which they were allowed a preferred claim.

It is elementary that fraud is never presumed and that the burden of proving it always rests upon him who asserts it.

As tending to show insolvency on January 22, 1932, petitioners point out that the evidence shows the following facts:

On October 2, 1931, the total deposits of the bank amounted to $514,789.43. It was indebted to other banks $75,770 on collateral loans, and its cash resources totaled $88,325.20, including cash on hand and cash on deposit with other banks. The bank's records show that on October 1, 1931, the officers of the bank listed 75 per cent ($312,182.85) of the total loans and discounts as slow, doubtful or worthless; that 22 per cent ($97,553.47) of the total loans and discounts had been made to officers and directors of the bank and their interests, and that 84 per cent of the loans and discounts were entirely unsecured.

During the month of October, 1931, the depositors of the bank began to make heavy withdrawals and continued to do so through November, and by December 1st the total deposits had been reduced by approximately $65,000. The withdrawal of the deposits imposed a heavy strain upon the cash resources of the bank which decreased from nearly $90,000 on October 2nd to $50,208.60 on December 31, 1931, a decline of nearly 50 per cent within a period of less than three

months. After January 1, 1932, the deposits continued to decrease from day to day in amounts ranging from $2,000 to $7,500. The withdrawals exceeded the deposits by these amounts, and the trend was consistent and continuous.

After January 1, 1932, the bank's cash position became more acute. The cash on hand totaled slightly over $50,000 on January 1st, but on January 11th the total cash resources had dropped to $26,198.90. Three days later the cash balance had declined to $24,203. Day by day the cash disbursements exceeded daily cash receipts, and it was apparent that unless conditions radically changed the money remaining on hand would soon give out. On January 18th the bank procured a cash loan of $28,000 from the National Credit corporation and to secure this loan put up collateral in the principal sum of $50,432.40, bringing the cash resources of the bank up to $51,094.79 on January 18th. Thereafter, the cash resources again dropped day by day and on January 21st amounted to about $24,000. When the bank suspended on January 27, 1932, all the realizable assets of the bank of value or credit had been pledged for loans to maintain cash reserves. The bank's collateral borrowings on January 18, 1932, amounted to $128,566.76. The situation was that unless these loans could be paid the collateral would be lost to the bank. There was no cash available to redeem the collateral, and there was not even sufficient cash available to meet the demands of depositors for more than a very few days. As a result of this situation, on January 22, 1932, the officers of the bank decided that unless the relation of withdrawals to deposit was materially improved from unexpected sources, the bank could not possibly remain open longer than January 26, 1932, and would then be closed. As a matter of fact, the bank ceased to function at the close of that day and was turned over to the auditor

of public accounts the next morning. By February 25, 1932, it was apparent the bank could not be reorganized; the receiver was appointed. A decree of dissolution was entered on August 13, 1932.

The evidence shows that the income received by the receiver up to the time of the hearing of the petition had been used in recovering pledged assets of the bank, and as a result no dividends have been received by any of the depositors. The report of the receiver as to assets and liabilities was received in evidence over his objection and shows a summary of the assets and liabilities of the bank as of April 1, 1932. It shows total assets of $470,857.01, reserve for depreciation on bonds of $7,200, and liabilities of $302,034.63.

The record does not disclose who were the officers, the directors or the stockholders of the bank. The printed statement which appears in the record as of January 22, 1932 (the date upon which the deposit was made) shows assets and liabilities of $640,954.43. A statement as of January 23, 1932, the day after these deposits were made, shows assets and liabilities respectively of $632,546.55. Included in the liabilities as of January 22nd and 23rd are capital stock of $100,000, surplus of $50,000 and undivided profits of $17,062.95.

The decree entered by the circuit court on August 13, 1932, which dissolved the bank, found "that from such examination of said bank and such report so made to him said auditor found and determined that its capital stock had become impaired in that items of assets included in said amount of resources, in an amount in excess of $114,205.99, were doubtful or wholly worthless, and that the aforesaid amount in said resources of said bank were then in excess of the aggregate amount of its surplus, reserve and undivided profits and that the condition of said bank was such that said impairment could not be made good."

In *People v. Clark,* 329 Ill. 104, our Supreme Court undertook to define the term ''insolvency'' within the meaning of the statute. The authorities of this and other States were reviewed, and it was pointed out that the term is used in different senses. Analyzing *Ellis v. State,* 138 Wis. 513, 20 L. R. A. (N. S.) 444, the opinion states:

''The court held that the term 'insolvent,' as used in such a statute, does not mean insolvent in the limited sense of inability to pay indebtedness in the ordinary course of business, but that the term means insolvent in the broad general sense of a deficit of one's assets in realizable cash available within a reasonable time, treated as an ordinarily prudent person would generally conduct his business under the same or similar circumstances, to pay his liabilities; and that a bank is insolvent, within the meaning of such a statute, when the cash value of its assets realizable in a reasonable time, in case of liquidation by its proprietors, as ordinarily prudent persons would generally close up their business, is not equal to its liabilities, exclusive of stock liabilities. This definition of the word 'insolvent,' as employed in the connection stated, expresses the common, ordinary meaning of the word, and for that reason must be taken to have been intended by the General Assembly in the enactment of the statute upon which the instant indictment is based.'' The opinion reviews *People v. Hartenbower,* 283 Ill. 591; *People v. Dubia,* 289 Ill. 276, and *People v. Belt,* 271 Ill. 342 (cases on which claimants here rely) saying that in those cases the fact of insolvency was ''clearly and indisputably established.''

In *People v. Gould,* 345 Ill. 288, the Supreme Court in considering the question of whether the bank was in fact insolvent when a deposit was received stated distinctly that impairment of capital did not necessarily mean insolvency and that in determination of

that question the original amount of the capital stock, the surplus and the undivided profits should be deducted from the total liabilities.

It is apparent that if these items in amounts as stated above are deducted from the liabilities of the First State Bank of Barrington, the proof falls short of showing that it was in fact insolvent upon the date the deposit was made.

In the *Gould* case the court went on to say that the value of commercial paper could not be shown by the opinions merely of experts, but that an inquiry should be made as to the solvency of the makers, as such facts were capable of proof. There is an entire absence of such evidence in this record either as to commercial paper or as to other assets of the bank. It is true, the evidence shows something over $90,000 of assets which consisted of indebtedness of officers and directors upon loans made to an illegal amount, but there is no proof that the persons liable for these loans were insolvent and the fact that a loan was for an illegal amount would not in any way tend to prevent its collection. Only four days before this deposit was made, the bank procured a cash loan of $28,000 by putting up collateral of the face value of about twice that amount, and the whole record indicates that its officers and directors were not without reasonable hope that the institution might be saved. It is apparent that no bank can continue to do business when all its customers demand their money at the same time, however solvent it may be in fact. We hold the proof here fails to show that this bank was in fact insolvent at the time the deposit of claimants was made, and, of course, its officers could not have had knowledge of any such insolvency.

Since claimants have failed to prove insolvency, it follows that the claim cannot be preferred, and it is unnecessary to consider the further contention of the

receiver that the claim cannot be identified. We have, however, given consideration to this point also. The evidence shows that the Barrington Bank maintained a deposit account with the Central Republic Bank of Chicago through which it cleared its Chicago checks by depositing them in that account. The checks of claimants deposited on January 22nd were credited to their account by the Barrington Bank which indorsed the checks and on the following day, the 23rd, sent the same to the Central Republic Bank. The Central Republic Bank presented these, with other checks, through the Chicago Clearing House, to the banks on which the checks were drawn. The checks were paid through the Chicago Clearing House on January 25th, and we presume the Republic Bank credited the account of the Barrington Bank with the proceeds.

The evidence tends to show that on January 22, 1932, the Barrington Bank had a credit to its account with the Central Republic Bank to the amount of $9,382.52, on January 23rd, a similar credit to the amount of $6,030.45 (January 24th was Sunday), on January 25th, a credit of $6,105.42, on January 26th, a credit of $2,359.69, and on January 27th, a credit of $1,812.04. The claimants say that at no time after the deposit was made was the balance in the account of the Central Republic Bank less than $1,071.58, which was the face amount of the two checks deposited, and that at no time was the total cash resources of the Barrington Bank (that is, the total amount of cash on hand and cash in other banks) less than this amount. However, it appears that on the 25th, namely, the day the checks cleared there were checks drawn against the Barrington Bank and paid by its clearing house agent, the Central Republic Bank, to an amount greater than was credited to the account of the Barrington Bank with the Central Republic Bank. On that

day it appears there was deposited $2,447.99 and $5,804.51 was paid out.

The receiver contends, plausibly we think, that in that transaction the identity of the fund upon which the claimants seek to impress a trust was destroyed. The *res* had disappeared.

Claimants cite *Woodhouse v. Crandall,* 197 Ill. 104, where our Supreme Court, following the reasoning in *In re Hallett's Estate,* 13 L. R. Ch. D. 696, laid down the general rule that the placing of a trust fund in a bank with a large sum of money, did not destroy its identity, where enough money always remained in the bank to satisfy the trust fund. This rule was based upon the presumption that the bank would withdraw its own money before appropriating that which was impressed with a trust and which it had no right to take. In the *Woodhouse* case a deposit was made under circumstances which disclosed the intention of both parties that it should not be mingled under any condition with the funds of the bank. There are no such circumstances here.

Indeed, under circumstances substantially similar to those which appear in this record, this court held in *People v. Michigan Ave. Trust Co.,* 242 Ill. App. 579, that the trust fund could not be traced and a preference was denied. In *Lanterman v. Travous,* 174 Ill. 459 (where the bank made a voluntary assignment) the Supreme Court held, distinguishing *American Trust & Savings Bank v. Gueder & Paeschke Mfg. Co.,* 150 Ill. 336, that a person who had deposited a check for which he received credit when the officers knew the bank was insolvent, could not (where his money had been mingled with other funds of the bank) have his claim preferred.

Claimants contend that if the receiver's interpretation of these cases is correct, the cases are inconsistent with later cases. They cite *Woodhouse v. Crandall,*

197 Ill. 104; *People v. Bates,* 351 Ill. 439; *People v. Auburn State Bank,* 215 Ill. App. 133; *People v. American Trust & Savings Bank,* 262 Ill. App. 458. In the *Bates* case, as in the *Crandall* case (and unlike this case) the deposit was special in its nature, and not intended by the parties to be mingled with the general assets of the bank, and those cases, we think, may be distinguished upon that ground.

The latest case of which we have knowledge is *People v. Peoples State Bank of Maywood,* 354 Ill. 519, where the court citing 7 University of Cincinnati Law Review, p. 201, sums up the law applicable as follows:

"Since the right to reclaim a trust fund is founded on the right of property, and not on the ground of compensation for its loss, the beneficiary must be able to point out the particular property into which the fund has been converted. When he is unable to do so, the trust fails and his claim becomes one for compensation only and stands on the same basis as the claims of general creditors. It is as necessary to trace the proceeds of a check or draft constituting part of a trust fund, as it is to trace the proceeds of any other species of personal property; and a trust fund traced into a bank account, if its identity can be established, and no superior rights of innocent parties have intervened, will be held for the benefit of the *cestui que trust.* The question in every case where it is sought to trace trust property is whether it can be identified in its original or altered form." The opinion says that the classic statement of the rule is by the Supreme Court of Pennsylvania in Thompson's Appeal, 22 Pa. St. 16, which was approved in *Union Nat. Bank of Chicago v. Goetz,* 138 Ill. 127.

Professor Bogert has pointed out (see Bogert on Trusts, p. 533) that the tendency of the later decisions of the courts is back to what is known as the "specific property" rule as distinguished from the "increased

assets'' theory in this class of cases, and that the "specific property" rule has been either accepted or so modified and limited "as to make it differ from the opposing rule only in words." As the Supreme Court of Rhode Island said in *Slater v. Oriental Mills,* 18 R. I. 352, while one who has been wronged may follow and take his own property, or its visible product, it is quite a different thing to say that he may take the property of somebody else.

There is no reason on this record why these claimants should have a preference as against the general creditors, many of whom (if we assume insolvency) are precisely in the same situation as claimants.

The order will be reversed and the cause remanded with directions that the claim against the bank be allowed as a general claim only.

*Reversed and remanded with directions.*

McSURELY and O'CONNOR, JJ., concur.